# 24-1982

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

## 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

PIMLICO, LLC, A Partner Other Than The Tax Matters Partner,

*Petitioner-Appellant,*

PICCIRC, LLC,

*Petitioner,*

– v. –

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES TAX COURT

## BRIEF AND SPECIAL APPENDIX
## FOR PETITIONER-APPELLANT

JEREMY H. TEMKIN
EDWARD M. SPIRO
CHRISTIAN B. RONALD
MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.
*Attorneys for Petitioner-Appellant*
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

CP COUNSEL PRESS    (800) 4-APPEAL • (331858)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iii

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION .......................................................3

ISSUES PRESENTED..........................................................................4

STATEMENT OF THE CASE................................................................4

STATEMENT OF FACTS .....................................................................6

      A.    The Investment Opportunity...................................................6

      B.    The Santa Barbara Duplicatas ................................................9

      C.    The Tax Impact of the Sale of the Duplicatas.....................12

      D.    Howard's Tax Returns .........................................................14

      E.    The Final Partnership Administrative Adjustment ..............16

      F.    Tax Court Proceedings.........................................................16

      G.    The Tax Court's Extraordinarily Delayed and
            Conclusory Opinion.............................................................23

SUMMARY OF ARGUMENT...............................................................27

ARGUMENT .....................................................................................30

  I.    Standard of Review ...................................................................30

  II.   The Tax Court Erred in Concluding that Santa Barbara's
      Contribution of the Duplicatas Was a Disguised Sale...............30

      A.    Applicable Law....................................................................30

      B.    The Tax Court Erred in Applying the Disguised Sale
            Presumption Under Treasury Regulation 1.707–3(c)(1) .................32

i

C.    Even If the Disguised Sale Presumption Applied, the Partnership Has Clearly Established that Santa Barbara's Contribution Was Valid ........................................................36

III.    The Tax Court Erred in Concluding that It Could Not Determine Santa Barbara's Tax Basis in the Duplicatas ............................................40

IV.    The Tax Court Erred in Concluding that XBOXT and PICCIRC Were Not Bona Fide Partnerships ............................................................44

V.    The Tax Court Erred in Applying the Anti-Abuse Rule to Recast the Investment Opportunity Transactions ......................................................48

A.    The Anti-Abuse Rule Is Invalid ..........................................................49

B.    Even If the Anti-Abuse Rule Is Valid, It Is Inapplicable .................52

VI.    The Anti-Abuse Doctrines Invoked by the IRS Below Are Inapplicable ......................................................................................55

VII.    If Any Anti-Abuse Doctrines Could Apply, Remand Is Necessary ........59

CONCLUSION ......................................................................................................61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*AD Global FX Fund, LLC v. United States*,
  No. 05 Civ. 223 (RKE), 2014 WL 1285503 (S.D.N.Y. Mar. 31, 2014) .............. 51

*Ahadpour v. Comm'r*,
  32 F. App'x 319 (9th Cir. 2002) ...................................................... 42

*Bank of N.Y. Mellon Corp. v. Comm'r*,
  801 F.3d 104 (2d Cir. 2015) .......................................................... 59

*BC Ranch II, L.P. v. Comm'r*,
  867 F.3d 547 (5th Cir. 2017) ..................................................... 12, 31

*Benenson v. Comm'r*,
  887 F.3d 511 (1st Cir. 2018) ......................................................... 56

*Benenson v. Comm'r*,
  910 F.3d 690 (2d Cir. 2018) ................................................. 55, 56, 57

*Broadwood Inv. Fund LLC v. United States*,
  611 F. App'x 440 (9th Cir. 2015) .................................................... 47

*Buyuk LLC v. Comm'r*,
  T.C. Memo. 2013-253, 2013 WL 5942309 (2013) ..................................... 38, 60

*Callaway v. Comm'r*,
  231 F.3d 106 (2d Cir. 2000) .......................................................... 30

*Claston, LLC v. United States*,
  No. 08 Civ. 48, 2012 WL 12953255 (D. N. Mar. I. Dec. 14, 2012) .............. 39, 40

*Comm'r v. Culbertson*,
  337 U.S. 733 (1949) ............................................................ 4, 26, 44

*Comtek Expositions, Inc. v. Comm'r*,
  99 F. App'x 343 (2d Cir. 2004) ....................................................... 45

*Edward L. Stephenson Tr. v. Comm'r*,
   81 T.C. 283 (1983)............................................................. 51

*Estate of Kahn v. Comm'r*,
   499 F.2d 1186 (2d Cir. 1974)........................................... 45

*Gilbert v. Comm'r*,
   248 F.2d 399 (2d Cir. 1957)............................................. 47

*Gluck v. Comm'r*,
   No. 21-867, 2022 WL 802766 (2d Cir. Mar. 17, 2022)........................................ 5

*Greenberg v. Comm'r*,
   10 F.4th 1136 (11th Cir. 2021)........................................ 5

*Greene v. United States*,
   13 F.3d 577 (2d Cir. 1994)............................................. 60

*Gutwirth v. Comm'r*,
   40 T.C. 666 (1963)......................................................... 42

*Hall v. Comm'r*,
   T.C. Memo. 1993-198, 1993 WL 142899 (1993)........... 45

*Ianoe v. Comm'r*,
   T.C. Memo 2009-68, 2009 WL 791751 (2009)............... 33

*Jade Trading, LLC v. United States*,
   60 Fed. Cl. 558 (2004)................................................... 51

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) .................................................. 49

*Luna v. Comm'r*,
   42 T.C. 1067 (1964)....................................................... 45

*Magwood v. Patterson*,
   561 U.S. 320 (2010) ...................................................... 50

iv

*Mazzini v. Rep. of Arg.*,
    282 F. App'x 907 (2d Cir. 2008) ........................................................... 33

*Muller v. First Unum Life Ins. Co.*,
    341 F.3d 119 (2d Cir. 2003)................................................................. 46

*Muserlian v. Comm'r*,
    932 F.2d 109 (2d Cir. 1991)................................................................. 41

*New Millenium Trading, LLC v. Comm'r*,
    T.C. Memo 2017-9, 2017 WL 89130 (Jan. 10, 2017) ......................... 51

*N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*,
    987 F.3d 207 (2d Cir. 2021)................................................................. 58

*Peking Inv. Fund LLC v. Comm'r*,
    T.C. Dkt. No. 12772-09, ECF No. 115 (Feb. 12, 2018) ...................... 48

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002) .............................................................................. 51

*Rep. of Arg. v. Weltover, Inc.*,
    504 U.S. 607 (1992) ............................................................................ 50

*RLC Indus. Co. v. Comm'r*,
    58 F.3d 413 (9th Cir. 1995) ................................................................. 51

*Robinson v. Shapiro*,
    646 F.2d 734 (2d Cir. 1981)................................................................. 34

*Route 231, LLC v. Comm'r*,
    810 F.3d 247 (4th Cir. 2016) ......................................................... 31, 38

*Route 231, LLC v. Comm'r*,
    T.C. Memo. 2014-30, 2014 WL 700397 (2014).................................. 35

*Rovakat, LLC v. Comm'r*,
    T.C. Memo. 2011-225, 2011 WL 4374589 (2011).............................. 45

*Scheidelman v. Comm'r*,
    682 F.3d 189 (2d Cir. 2012)............................................................ 30, 60

*Scheideliman v. Comm'r*,
    755 F.3d 148 (2d Cir. 2014).................................................................. 41

*Southgate Master Fund, L.L.C. v. United States*,
    659 F.3d 466, (5th Cir. 2011)................................................... 12, 13, 47

*Southgate Master Fund, LLC v. United States*,
    651 F. Supp. 2d 596 (N.D. Tex. 2009) ........................................ 43, 51

*Superior Trading, LLC v. Comm'r*,
    137 T.C. 70 (2011)................................................................... 35, 43, 58

*TIFD III-E, Inc. v. United States*,
    459 F.3d 220 (2d Cir. 2006)................................................................ 44

*United States v. Cummings*,
    858 F.3d 763 (2d Cir. 2017)................................................................ 34

*United States v. Kahn*,
    5 F.4th 167 (2d Cir. 2021) ............................................................ 49, 51

*United States v. Woods*,
    571 U.S. 31 (2013) .................................................................. 12, 14, 16

*Va. Historic Tax Credit Fund 2001 LP v. Comm'r*,
    639 F.3d 129 (4th Cir. 2011)...................................................... *passim*

**Statutes:**

26 U.S.C. § 704(c) ......................................................................... 13

26 U.S.C. § 707(a) .................................................................... 30, 31

26 U.S.C. § 721 .............................................................................. 12

26 U.S.C. § 723 ........................................................................ 12, 41

vi

26 U.S.C. § 988(b) ........................................................................ 14, 41

26 U.S.C. § 1011(a) ............................................................................ 41

26 U.S.C. § 1012 .......................................................................... 13, 41

26 U.S.C. § 6226 .................................................................................. 5

26 U.S.C. § 7482 .................................................................................. 3

26 U.S.C. § 7805(a) ........................................................................... 50

American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 833
   118 Stat. 1418 (2004)
     ........................................................................................ 13, 58

Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101
   129 Stat. 584 (2015) .................................................................... 5

Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 71,
   98 Stat. 494 (1984) ..................................................................... 56

Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, § 7642,
   103 Stat. 2106 (1989) ................................................................. 57

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,
   96 Stat. 324 (1982) ....................................................................... 4

**Regulations:**

26 C.F.R. § 1.701–2 .................................................................... *passim*

26 C.F.R. § 1.704–3(a)(7) ............................................................. 13, 57

26 C.F.R. § 1.707–3(b) ................................................................. *passim*

26 C.F.R. § 1.707–3(c) ...................................................................... 32

26 C.F.R. § 1.723–1 ................................................................. 12

26 C.F.R. § 1.988–1(a) ............................................................ 41

Subchapter K Anti-Abuse Rule,
  60 Fed. Reg. 18,741 (Apr. 13, 1995).................................... 50

**Rules:**

Fed. R. App. P. 13(a)(1)(A) ...................................................... 3

Fed. R. Evid. 803(6)(D) ............................................................ 33

**Other Authorities:**

*Commentators Say Partnership Antiabuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*,
  95 Tax Notes Today 175-28 (Aug. 18, 1995).......................... 50

H.R. Rep. No. 98-861 (1984) (Conf. Rep.) .............................. 56

H.R. Rep. 101-247 (1989)......................................................... 57

H.R. Rep. No. 108-755 (2004) (Conf. Rep.) ............................ 58

Internal Revenue Service, U.S. Dep't of Treasury, *Internal Revenue Manual*
  § 4.32.2.15(1) (rev. 2018)...................................................... 52

William S. McKee et al., *Federal Taxation of Partnerships & Partners* (perm. ed., rev. 2024)........................................................... 50, 51

S. Rep. No. 101-56 (1989) ....................................................... 57

Arthur B. Willis et al., *Partnership Taxation* (perm. ed., rev. 2024) ............... 13, 50

## **INTRODUCTION**

This case concerns a 2002 tax deduction properly recognized by a partnership, PICCIRC, LLC (the "Partnership"), under the provisions of the Internal Revenue Code (the "Code") then in effect. The deduction related to the sale of distressed Brazilian receivables that were contributed to the Partnership in 2002, and which had a face value far exceeding the amount for which they were sold. The Partnership's 2002 deduction flowed through to Petitioner-Appellant, PIMLICO, LLC ("Petitioner")—which was itself a partnership—and was recognized by Petitioner's tax matters partner, John D. Howard, on his individual 2003 and 2004 tax returns.

The tax deduction at issue complied with the relevant Code provisions in effect in 2002. Indeed, Congress amended the relevant statutory provisions in 2004 with the express purpose of eliminating lawful tax deductions like the one recognized in this case. Despite this, Respondent-Appellee, the Internal Revenue Service (the "IRS"), refused to recognize the Partnership's 2002 deduction and— after a prolonged audit process—issued a Notice of Final Partnership Administrative Adjustment (the "FPAA") to the Partnership in November 2011.

After the IRS issued the FPAA, Petitioner promptly filed an action in the United States Tax Court challenging the FPAA. A trial was held in March 2015, and the parties completed their post-trial briefing by July 2015. Nearly *nine years*

1

*later*, the Tax Court issued a cursory twelve-page Memorandum Findings of Fact and Opinion (the "Memorandum Opinion")—which relied almost exclusively on the parties' pre-trial stipulated facts and contained less than six pages of legal analysis—sustaining the IRS's determinations in the FPAA.

A nine-year delay in deciding any bench trial is extraordinary, but it is particularly egregious here given the cursory nature of the Tax Court's opinion. The Tax Court upheld the FPAA on four equally flawed grounds. Specifically, the Tax Court erroneously concluded:

(1)    the transactions underlying the tax deduction at issue constituted a "disguised sale," despite the inapplicability of the Treasury regulation upon which the Tax Court relied;

(2)    it could not determine the original contributing partner's tax basis in the Brazilian receivables ultimately contributed to the Partnership, despite ample evidence in the record permitting it to do so;

(3)    two of the entities involved in this case, including the Partnership, were not bona fide partnerships, ignoring key testimony regarding the partners' intent; and

(4)    the Partnership's tax deduction should be invalidated under Treasury Regulation § 1.701-2, a regulation that stands on such infirm ground that the IRS has withdrawn reliance on it in litigation.

After reaching these incorrect conclusions, the Tax Court declined to address the IRS's alternative arguments for upholding the FPAA, all of which would have required additional factfinding.

2

Each of the Tax Court's rationales for upholding the FPAA is infected with error, but each of those errors speaks to the same core defect in the Memorandum Opinion: despite taking nine years to issue its decision, and despite having every opportunity to examine the detailed documentary and trial record in this case, the Tax Court took shortcut after shortcut to reach what seems to have been a predetermined result in favor of the IRS. This Court should reverse the Tax Court's flawed decision.

## STATEMENT OF JURISDICTION

Petitioner's appeal arises from a final decision entered in the Tax Court on April 24, 2024, following a trial held on March 2–3, 2015 and the Memorandum Opinion issued by the Tax Court on April 22, 2024. (SPA-1–13; A-1524–1975.)[1] Petitioner timely filed its notice of appeal on July 18, 2024. (A-2056–59); Fed. R. App. P. 13(a)(1)(A). This Court has jurisdiction to review the final decision of the Tax Court under 26 U.S.C. § 7482(a)(1), and venue in this Court is proper both under 26 U.S.C. § 7482(b)(1)(G)(ii), because Petitioner's principal place of business was in New York, New York at the time the Petition was filed (A-56), and under 26 U.S.C. § 7482(b)(2), in light of the parties' written agreement as to appellate venue (A-2010, 2052).

---

[1] "A-" and "SPA-" refer, respectively, to the Appendix and Special Appendix filed with this brief.

3

## ISSUES PRESENTED

1.      Whether the Tax Court erred in concluding that the transaction underlying the 2002 tax deduction recognized by the Partnership was a disguised sale.

2.      Whether the Tax Court erred in concluding that it could not determine the original contributing partner's tax basis in the Brazilian receivables ultimately contributed to the Partnership.

3.      Whether the Tax Court erred in concluding that two of the partnership entities at issue in this case were not bona fide partnerships under the test set forth in *Commissioner v. Culbertson*, 337 U.S. 733 (1949).

4.      Whether the Tax Court erred in affirming the FPAA under the anti-abuse rule, 26 C.F.R. § 1.701–2, because: (a) that regulation is invalid; and (b) even if the regulation is valid, by its own terms, it does not apply to this case.

5.      Whether this Court should: (a) reject the application of the anti-abuse doctrines otherwise relied upon by the IRS in the FPAA; or (b) in the alternative, remand this case for the Tax Court to address those doctrines in the first instance.

## STATEMENT OF THE CASE

This is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (1982), formerly codified at 26

4

U.S.C. §§ 6221–6233.  Although TEFRA's partnership provisions were repealed and replaced by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101, 129 Stat. 584, 625–38 (2015), this case is governed by the provisions of the Code in effect in 2002, the tax year at issue here.  *See Greenberg v. Comm'r*, 10 F.4th 1136, 1144 & n.1 (11th Cir. 2021); *Gluck v. Comm'r*, No. 21-867, 2022 WL 802766, at *1 & n.2 (2d Cir. Mar. 17, 2022).[2]

On April 17, 2003, the Partnership filed its Form 1065, U.S. Return of Partnership Income for the 2002 taxable year, in which it claimed a $22,718,351 ordinary loss deduction.  Over eight years later, on November 15, 2011, the IRS issued the FPAA in which it disallowed the Partnership's claimed 2002 loss deduction.  On February 15, 2012, Petitioner timely filed a Petition for readjustment of the FPAA in the Tax Court.  *See* 26 U.S.C. § 6226.

A trial was held in New York, New York on March 2–3, 2015.  The parties' post-trial briefs were fully submitted on July 2, 2015.

On April 22, 2024, after a delay of nearly nine years, the Tax Court issued the Memorandum Opinion sustaining the FPAA.  Two days later, the Tax Court entered a final decision in favor of the IRS.

---

[2] Accordingly, unless otherwise noted, citations to the Code and related Treasury regulations in this brief are to the versions in effect in 2002.

5

On July 18, 2024, Petitioner timely filed a notice of appeal to this Court from the Tax Court's Memorandum Opinion and its subsequent decision.

### STATEMENT OF FACTS

**A.    The Investment Opportunity**

Petitioner's tax matters partner, John D. Howard, has over four decades of experience investing in distressed companies and assets.  (A-40–41, 1550–66.)  Throughout his career, Howard has consistently invested in underperforming companies and assets that other investors have shied away from, generating outsized returns on relatively small investments of capital.  For instance, in the 1980s, while working at Wesray Capital Corporation, a pioneering private equity firm focused on leveraged buyouts of underperforming companies, Howard led Wesray's purchase of Avis.  In that transaction, Wesray put up none of its own capital and sold Avis a year later for a $770 million profit.  (A-40, 1553–54.)  In 1997, Howard founded Irving Place Capital, a private equity firm focused on investing in middle-market companies.  (A-41, 1556–57.)  Through Irving Place Capital (then known as Bear Stearns Merchant Banking), Howard invested approximately $6 million in the retailer Aéropostale, which numerous other investors had looked at and considered to be worthless.  (A-40, 1557.)  Howard later sold Aéropostale for more than $500 million.  (A-1557–58.)

6

As in his professional career, Howard has sought out unique investment opportunities for his personal funds, with a particular focus on distressed companies and assets. Prior to 2002, Howard had purchased multiple companies in or on the verge of bankruptcy, and as of 2002, he had placed a significant portion of his liquid net worth into investment funds focused on the U.S. distressed debt market. (A-42, 1559–62.) These investments reflected Howard's belief that, although there had been a major economic downturn in the early 2000s, there would be a quick correction. (A-1562.) He therefore saw the distressed debt market as "the place to get the biggest bang for the buck," as debt securities that many investors believed were "worthless" in the early 2000s could appreciate considerably. (A-1562–63.)

Against this backdrop, Howard was approached in 2002 by the global accounting firm BDO Seidman, LLP ("BDO") regarding an investment opportunity in foreign distressed debt assets (the "Investment Opportunity"). (A-39, 1570.) Given BDO's reputation as a significant accounting firm, and his own experience investing in distressed assets, Howard was particularly interested in the Investment Opportunity, as it allowed him to diversify his portfolio beyond the U.S. market. (A-1570–71.)

BDO introduced Howard to Gramercy Advisors LLC ("Gramercy"), an investment advisory firm that would be responsible for managing the Investment

7

Opportunity.  (A-37, 1571.)  Gramercy was a well-known investment manager with a proven track record in investing in distressed assets in emerging foreign markets. (A-1357, 1820.)  Gramercy explained to Howard that they owned a pool of Brazilian receivables that investors like Howard could invest in at "a penny to two pennies on the dollar," and that Gramercy had achieved "significant recoveries in the past" on similar types of assets.  (A-1573.)  Howard therefore saw the Investment Opportunity as having "significant upside"—much like the investments that he had successfully carried out earlier in his career and his investments in U.S. distressed debt.  (A-1573.)  BDO explained to Howard that the Investment Opportunity also carried with it one significant additional benefit: if the distressed Brazilian assets did not generate a return on Howard's investment, the structure of the Investment Opportunity presented "potentially significant tax benefits."  (A-1633.)

After meeting with BDO and Gramercy, Howard agreed to participate in the Investment Opportunity.  (A-46, 48.)  Through consulting and investment management agreements with BDO and Gramercy, Howard agreed to pay various fees in connection with the Investment Opportunity—which was consistent with Howard's experience as an investor.  (A-1613.)  In Howard's view, the fees were simply part of the cost of acquiring the Brazilian receivables, which he understood were "undervalued" with "a significant opportunity for appreciation."  (A-1613.)

8

### B.    The Santa Barbara Duplicatas

The Brazilian receivables at issue in the Investment Opportunity were originally owned by Santa Bárbara Indústria e Comércio de Ferro Ltda. ("Santa Barbara"), a privately owned Brazilian metal products supplier.  (A-42.)  In 1996, Santa Barbara issued 125 "*duplicatas*" to Encol S/A Eng. Comércio Indústria ("Encol"), a Brazilian construction company.  (A-42, 111–407.)  Under Brazilian law, *duplicatas* are orders for payments issued by a creditor to a debtor related to the sales of goods or services that are evidenced by an invoice.  (A-1073–75.)  Thus, the *duplicatas* Santa Barbara had issued to Encol (the "Duplicatas") were instruments that reflected debts owed by Encol to Santa Barbara.  (*See* A-660–61 (opinion letter from Brazilian law firm concluding that the Duplicatas "create[d] a valid, binding and enforceable obligation of [Encol]" and were "enough to provide a legal action against [Encol]").)  The 125 Duplicatas had a face value of 28,740,000 Brazilian Reals, which translated to approximately $28 million under the exchange rates in effect when the Duplicatas were issued.  (A-42–43, 405–07.)

The Investment Opportunity was carried out through a three-tiered partnership structure.  On August 1, 2002, Santa Barbara and Gramercy Investment Management LLC ("Gramercy Investment"), an affiliate of Gramercy, formed XBOXT LLC, a Delaware limited liability company ("XBOXT"), and Santa Barbara contributed the 125 Duplicatas in exchange for a 99% membership interest

9

in XBOXT. (A-42–44, 408–21.) Gramercy Investment simultaneously contributed interests in two promissory notes in exchange for a 1% membership interest in XBOXT. (A-43.) Following these contributions, XBOXT LLC's two members were Santa Barbara (with a 99% membership interest) and Gramercy Investment (with a 1% membership interest). (A-44.) XBOXT was governed by a Limited Liability Company Operating Agreement, dated August 1, 2002, under which Santa Barbara and Gramercy Investment agreed that: (1) neither would be entitled to any interest on or right to the return of their capital contributions; (2) they would share in the profits and losses of XBOXT in proportion to their membership interests and would bear the federal tax consequences of those profits and losses; (3) they would share all liabilities and debts of XBOXT in proportion to their membership interests; (4) Gramercy Investment would be the sole manager of XBOXT; and (5) if Santa Barbara withdrew from XBOXT, it would not be entitled to payment for its initial capital contribution without Gramercy Investment's approval. (A-436–55.)

On October 2, 2002, Petitioner (PIMLICO LLC) was formed, and on November 22, 2002, XBOXT LLC contributed 104 of the Duplicatas with a face value of 23,585,000 Brazilian Reals in exchange for a 99% membership interest in Petitioner. (A-44–45, 469.) That same day, Tall Ships Capital Management LLC ("Tall Ships"), an entity affiliated with Gramercy, contributed interests in two

10

promissory notes in exchanges for a 1% membership interest in Petitioner. (A-38, 45.)

On December 11, 2002, several months after Santa Barbara originally contributed the Duplicatas to XBOXT, Howard acquired an 89.1% membership interest in Petitioner from XBOXT for $300,163.53. (A-46.) After this purchase, Petitioner had three members: Howard (with an 89.1% membership interest), XBOXT (with a 9.9% membership interest), and Tall Ships (with a 1% membership interest). (A-47.) Petitioner was governed by an Amended and Restated Limited Liability Company Operating Agreement, dated December 16, 2002, which contained substantively the same terms as the XBOXT Operating Agreement. (A-538–77.) Howard was designated as the sole manager and tax matters partner of Petitioner. (A-544, 569.)

The Partnership (PICCIRC LLC) was established as a Delaware limited liability company, and it was used by Gramercy to manage Howard's investment in the Duplicatas. (A-47.) On December 11, 2002, Petitioner contributed the 104 Duplicatas that it had received from XBOXT to the Partnership in exchange for a 99% membership interest in the Partnership, and Tall Ships contributed interests in two promissory notes in exchange for a 1% membership interest in the Partnership. (A-47.) The Partnership was governed by a Limited Liability Company Operating Agreement with substantially the same terms as the XBOXT and PIMLICO

11

Operating Agreements, and Tall Ships was designated as the sole manager and tax matters partner of the Partnership. (A-47–48, 592–631.)

After Petitioner contributed the Duplicatas to the Partnership, Howard was not involved in the management of those assets. (A-1582–83.) As Howard testified at trial, through his agreements with Gramercy, Gramercy and its affiliates were "getting paid to do what they do best, and so [he] let them do what they do best." (A-1582–83.) Unbeknownst to Howard, and without his direction, on December 26, 2002, the Partnership sold its entire interest in the Duplicatas to Gramercy Financial Services LLC for $357,144.29. (A-49, 1583.)

## C.    The Tax Impact of the Sale of the Duplicatas

When a partner contributes property in exchange for an interest in a partnership, "the transaction is tax-free to both the partner and the partnership." *BC Ranch II, L.P. v. Comm'r*, 867 F.3d 547, 556–57 (5th Cir. 2017) (citing 26 U.S.C. § 721). Instead of being taxed at the time of the contribution, the partnership assumes the contributing partner's tax basis in the property, and taxation is deferred until the property is sold.[3]  *See Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 471 & nn.9–10 (5th Cir. 2011) (citing 26 U.S.C. § 723; 26 C.F.R. § 1.723–1).

---

[3] "Tax basis is the amount used as the cost of an asset when computing how much its owner gained or lost for tax purposes when disposing of it." *United States v. Woods*, 571 U.S. 31, 35 (2013).

12

Ordinarily, a contributing partner's basis in contributed property is the cost of the property to that partner. *See* Arthur B. Willis et al., *Partnership Taxation* ("*Willis*") ¶ 5.02 n.25 (perm. ed., rev. 2024) (citing 26 U.S.C. § 1012). If contributed property has a fair market value at the time of the contribution that is higher or lower than the cost of the property to the contributing partner, the property is referred to as having a "built-in" gain or loss—because the partner's basis in the property passes to the partnership under 26 U.S.C. § 723. *See Southgate*, 659 F.3d at 472.

In 2002, Section 704(c) of the Code required that, if a partner transferred its partnership interest to another partner, the transferee stepped into the shoes of the transferor and assumed the transferor's proportional share of any built-in gain or loss. *See* 26 U.S.C. § 704(c)(1), (c)(3); 26 C.F.R. § 1.704–3(a)(7). In 2004, Congress amended the Code to preclude, on a going-forward basis, the type of deduction that the Partnership recognized here. *See* American Jobs Creation Act of 2004 (the "AJCA"), Pub. L. No. 108-357, § 833(a), 118 Stat. 1418, 1589 (2004) (limiting the built-in loss that may be recognized by partners other than the original contributing partner). Because the ACJA was not made retroactive, however, *see id.* § 833(d), 118 Stat. at 1592, the pre-2004 law is applicable to the transactions at issue in this case.

13

Consistent with the governing statutes, Santa Barbara's basis in the Duplicatas was their face value at the time they were issued—their cost to Santa Barbara—since: (1) the full amount of the Duplicatas was outstanding at the time they were contributed to XBOXT; and (2) Santa Barbara had not written the Duplicatas down (or off) prior to contributing them to XBOXT. (A-411–12, 1095.) For federal tax purposes, this face value was then converted to U.S. dollars under the applicable exchange rate when the Duplicatas were issued. *See* 26 U.S.C. § 988(b)(1)–(2).

Pursuant to Sections 704, 721, and 723 of the Code, the built-in loss followed the Duplicatas as they were contributed first to XBOXT, then to Petitioner, and ultimately to the Partnership. Accordingly, when the Partnership sold 104 of the Duplicatas for $357,144.29, the Partnership was entitled to an ordinary loss deduction of $22,718,351, which it claimed on its 2002 partnership return (the "2002 Deduction"). (A-47, 49, 952.)

### D. Howard's Tax Returns

As a partner in Petitioner, Howard claimed flow-through ordinary loss deductions from the Partnership's 2002 Deduction proportionate to his interest in Petitioner and Petitioner's interest in the Partnership. (A-2001, 2047.) Howard's individual tax returns are not at issue in this partnership-level proceeding. *See Woods*, 571 U.S. at 39 (explaining the two-stage framework of TEFRA

14

proceedings). Nonetheless, it is notable that Howard claimed losses only after receiving detailed tax advice confirming the validity of the 2002 Deduction.

*First*, Howard received a tax opinion from Proskauer Rose LLP ("Proskauer"). Proskauer's opinion concluded, among other things, that: (1) the entities that carried out the Investment Opportunity should be classified as partnerships for federal tax purposes; (2) the built-in loss recognized through the 2002 Deduction was a proper application of the provisions of the Code then in effect; (3) Howard's claimed loss deductions stemming from the 2002 Deduction were proper; and (4) no anti-abuse doctrines or other provisions of the Code applied that would preclude recognition of the Partnership's loss. (A-722–24.) Howard paid Proskauer $100,000 for its tax opinion. (A-53–54, 1588–89.)

*Second*, Howard received a tax opinion from BDO. BDO's opinion, like Proskauer's opinion, concluded that the entities involved in the Investment Opportunity were valid partnerships for federal tax purposes and that the 2002 Deduction and Howard's flow-through claimed losses were valid (and, indeed, required) under the Code. (A-813–15.) Howard paid BDO $75,000 for its tax opinion. (A-1589.)

*Finally*, Howard's 2003 and 2004 tax returns were reviewed and approved by PricewaterhouseCoopers ("PwC") before they were filed. (A-1588.) PwC had

15

been Howard's accounting firm for more than 20 years at the time he filed the tax returns at issue and oversaw all aspects of his tax returns.  (A-1588.)

### E.     The Final Partnership Administrative Adjustment

At some point, the IRS initiated an audit of the Partnership's 2002 return. More than *eight years* after the partnership return was filed, on November 15, 2011, the IRS issued the FPAA notifying Petitioner that it had disallowed the Partnership's 2002 Deduction.  (A-960–71.)  The FPAA disallowed the 2002 Deduction on several grounds, including that: (1) the Partnership did not establish that it had any basis in the Duplicatas; (2) the Partnership did not establish that it was formed for a bona fide business purpose, so its form should be disregarded; (3) Santa Barbara's contribution of the Duplicatas was not a true partnership contribution, and was in fact a disguised sale; and (4) the Partnership's principal purpose was to reduce its partners' tax liabilities, and it should therefore be disregarded under Treasury Regulation 1.701–2, the anti-abuse rule.  (A-968–70.)[4]

### F.     Tax Court Proceedings

Petitioner timely filed a Petition for readjustment of the FPAA in the Tax Court on February 15, 2012, pursuant to 26 U.S.C. § 6226(b).  (A-2.)  An

---

[4]  The FPAA also concluded that certain accuracy-related penalties applied.  (A-971.)  The Tax Court ultimately upheld the application of those penalties at the partnership level (SPA-12), but it did not address any partner-level defenses, which can only be addressed in a subsequent proceeding, *see Woods* 571 U.S. at 40–41.

16

Amended Petition was filed on March 19, 2012, which challenged each of the IRS's determinations in the FPAA and asserted the validity of the 2002 Deduction. (A-15–27.)

The case proceeded through discovery and to trial in New York City on March 2–3, 2015. (A-3–5, 977.) At trial, three witnesses testified on behalf of Petitioner: Howard, Professor Albert Fishlow, an expert in Brazilian economic history and the Brazilian economy, and João Laude de Camargo, an expert in Brazilian capital markets and Brazilian commercial law. (A-977, 1637–39, 1648.)

Howard testified at length regarding his investment background, including his particular focus on investing in distressed companies and distressed debt. (A-1551–69.) Howard also testified about his experience with the Investment Opportunity here, including his intention to diversify his distressed debt portfolio to include foreign assets. (A-1570.) Howard explained that he understood Gramercy had a good track record of investing in foreign distressed debt like the Duplicatas, including because "there had been significant recoveries" on those debts in the past. (A-1570–74.) Howard therefore saw the Investment Opportunity as having "significant upside." (A-1573.) Howard also testified that he understood, based on conversations with BDO, that there could be potential tax benefits from the Investment Opportunity if the upside he saw in the Duplicatas did not materialize. (A-1633.) Nonetheless, Howard testified that he did not have any

17

predetermined agreement that the Investment Opportunity would generate tax losses.  (A-1633–34.)

Fishlow testified to the state of the Brazilian economy in 2002, when the Investment Opportunity was carried out.  (A-1004–21, 1640–45.)[5]  He explained that there were several political and macroeconomic developments in Brazil in the early 2000s—including the election of a new president in October 2002—that could lead a reasonable investor to believe that: (1) the Brazilian Real would strengthen against the U.S. Dollar; and (2) Brazilian interest rates would decrease from their elevated 2002 levels.  (A-1641–42.)  Fishlow further testified that a strengthening of the Brazilian Real and a decrease in Brazilian interest rates could increase the value of assets like the Duplicatas.  (A-1642–43.)  In fact, Fishlow explained that the state of the Brazilian economy in late 2002 made Brazilian distressed debt an attractive investment, and that distressed debt assets were being sold to foreign investors during that period in increasing quantities.  (A-1643.)  Accordingly, Fishlow opined that it would have been reasonable for an investor to invest in Brazilian distressed debt like the Duplicatas in December 2002.  (A-1643.)

---

[5] The parties' experts presented direct testimony both through their written reports and limited oral testimony at trial.  (*See* A-1640.)

Camargo testified regarding the history of Encol, the company to which Santa Barbara had issued the Duplicatas, including its bankruptcy proceedings beginning in the late 1990s. (A-1090–93.) Camargo explained that, under Brazil's Bankruptcy Act of 1945, an entity in financial distress could be subjected to either a bankruptcy proceeding or a "*concordata*" proceeding. (A-1076.) A Brazilian bankruptcy proceeding would result in the acceleration of outstanding debts, the sale of the debtor's assets to satisfy creditors, and the liquidation of the business. (A-1076.) A *concordata* proceeding, on the other hand, would permit a business to continue operating under judicial administration while servicing payments to unsecured creditors. (A-1076.) Camargo testified that a business already embroiled in bankruptcy could apply for and receive a "suspensive *concordata*," thereby avoiding the liquidation of its assets, and resume functioning under court supervision. (A-1078.)

Camargo opined that a reasonable investor could have seen value in the Duplicatas because, through the procedural mechanisms available under Brazilian law, Encol could have emerged from bankruptcy. (A-1704–06.) Camargo testified that, as of December 2002 (when the Duplicatas were contributed to XBOXT), Encol still had the opportunity to apply for a suspensive *concordata*. (A-1703–04.) In fact, another Brazilian company in a bankruptcy proceeding before the same court handling the Encol bankruptcy had been granted a suspensive *concordata* on

19

October 10, 2002. (A-1098.) Since the Brazilian residential property sector was strengthening in the early 2000s, and Encol was a construction company, Camargo further opined that this could have made investing in Encol's debts attractive to a foreign investor. (A-1090, 1098, 1703–04.) Thus, although Camargo recognized that the chances of recovery on the Duplicatas were slim—which is what made them a distressed debt asset—he concluded that it was certainly reasonable for investors like Gramercy and Howard to see value in the Duplicatas. (A-1704–06.)

Finally, Camargo testified regarding the value of the Duplicatas under general accounting principles commonly applied in Brazil in 2002. (A-1093–95.) Camargo reviewed the legal opinion prepared for XBOXT by Brazilian counsel in 2003, which concluded that the Duplicatas were valid and enforceable at the time they were contributed to XBOXT. (A-1045; A-660–61.) Camargo also reviewed Santa Barbara's Contribution Agreement, in which it represented that the total value of the Duplicatas was outstanding at the time of their contribution, and that Santa Barbara had not written those receivables down (or off) on its balance sheet. (A-1045; A-411–12.) Based on this review and Camargo's familiarity with Brazilian accounting standards in effect in 2002, he concluded that "[a]ll evidence suggests that the [Duplicatas] were maintained at their original values" when they were contributed to XBOXT. (A-1095.)

20

The IRS also presented three witnesses at trial: Sergio Tostes, an expert in Brazilian bankruptcy law, Marti Murray, an expert in investment advising and distressed debt investing, and Professor David Babbel, an expert in investments and valuation of fixed income assets.  (A-977, 1715–19, 1808–09, 1841.)

Tostes, like Camargo, testified regarding Brazilian bankruptcy proceedings, and the likelihood that Encol could emerge from bankruptcy via a suspensive *concordata*.  (A-1336–39.)  Tostes opined that Encol could not have qualified for a suspensive *concordata* because its president had been convicted of financial crimes.  (A-1334–36.)  Camargo disagreed with this analysis, explaining that once Encol's president had served his sentence, Encol was once again eligible for a suspensive *concordata*—an opinion supported by legal academics in Brazil.  (A-1700–01.)

Tostes also opined that, even if Encol could have applied for a suspensive *concordata*, it would have been "simply impossible" for Encol to meet the requirements of demonstrating its viability as a business.  (A-1338.)  When pressed on this opinion during cross-examination, however, Tostes conceded that, particularly if there was an infusion of money from a new investor, it was possible that Encol could qualify for a suspensive *concordata*.  (A-1773.)  Indeed, one of Camargo's key points of disagreement with Tostes was the latter's focus solely on Encol's balance sheet (which everyone agreed qualified the company for

21

bankruptcy) and failure to consider the potential value of Encol (and, therefore, the Duplicatas) if the company received an infusion of new money or if macroeconomic conditions shifted.  (A-1702–03.)

Murray testified regarding Gramercy and the Investment Opportunity. Murray testified that Gramercy was a well-known, sophisticated investment manager specializing in distressed debt in emerging markets.  (A-1357, 1820.)  In December 2002, Gramercy's flagship fund had approximately $300 million to $500 million in assets under management, with a stated strategy of investing in distressed, defaulted, or undervalued sovereign and corporate emerging market debt securities.  (A-1357, 1820.)  Murray further testified that the principals of Gramercy were experienced investors in distressed debt assets.  (A-1820.)

Murray also expressed her view that the fees that Howard paid to BDO and to Gramercy were unusually high from a traditional investment perspective.  (A-1358.)  On cross-examination, however, Murray admitted that she did not know whether Howard actually paid the amounts for which he was originally invoiced. (A-1825–26.)  And, in fact, Howard testified that the fees he paid to BDO had been reduced because the Investment Opportunity did not achieve the financial results he had hoped.  (A-1580–81, 1614.)

Babbel testified regarding the value of the Duplicatas when they were contributed by Santa Barbara to XBOXT.  Applying traditional fair market

valuation analyses, Babbel concluded that the Duplicatas were worthless. (A-1433–35, 1460.) But as Howard explained at trial, performing traditional analyses on highly distressed debt investments (which often involved companies deep into bankruptcy with little hope of recovery) would never lead an investor to make a distressed debt investment. (A-1567–68.) In short, Babbel's traditional valuation analysis failed to account for a variety of qualitative or unexpected factors that might make investing in Brazilian distressed debt appealing to sophisticated investors in late 2002. As Petitioner's experts testified, there was a growing international market for assets like the Duplicatas in the early 2000s. (A-1097, 1641–43.) Given Gramercy's experience and success in investing in such assets, as well as Howard's background in investing in similarly high-upside distressed companies and assets in the United States, the Duplicatas presented a unique investment opportunity that ultimately led Howard to invest in Petitioner. (A-1570–74.)

### G. The Tax Court's Extraordinarily Delayed and Conclusory Opinion

The parties completed their post-trial briefing on July 2, 2015. (A-12–13.) Nearly *nine years* later, on April 22, 2024, the Tax Court issued its Memorandum

Opinion.[6]  (A-13.)  The Memorandum Opinion contains no citations to the record,

no credibility findings, no reference to Howard's trial testimony regarding his

intentions for pursuing the Investment Opportunity, and no reference to the detailed

expert testimony offered by the parties.  (SPA-2–5.)  Indeed, the Tax Court's four

pages of "Findings of Fact" consist almost exclusively of facts to which the parties

had stipulated before trial.  (*See* A-34–58.)

As for legal conclusions, the Memorandum Opinion contains just six pages

of legal analysis, which affirm the FPAA on several narrow grounds.  *First*, the Tax

Court held that Santa Barbara's contribution of the Duplicatas to XBOXT was not

a valid partnership contribution but was instead a disguised sale, which rendered

inapplicable the ordinary nonrecognition rule under Section 721 of the Code.

(SPA-6–8.)  The Tax Court reached this conclusion based on its assumption that

Santa Barbara had made a partial withdrawal of its partnership interest in XBOXT

several months after contributing the Duplicatas, which, under the relevant

regulations, would have triggered a presumption that the contribution was a

---

[6] The Tax Court's extraordinary delay not only unnecessarily delayed finality in
this case; it has substantially increased Howard's financial exposure.  The IRS will
likely impose interest on any deficiencies that it assesses against Howard, at
inflated statutory rates, running back to 2004 and 2005 when he filed his individual
tax returns.  Petitioner estimates that the Tax Court's delay in issuing its summary
decision (as compared to a more reasonable window of one or even two years)
could cost Howard approximately $8 million in accrued interest.

disguised sale. (SPA-7.) Ignoring Petitioner's post-trial arguments for why the disguised sale rule should not apply, the Tax Court summarily concluded that Petitioner failed to counter the disguised sale presumption and "failed to meet its burden of proof." (SPA-7–8.)

*Second*, the Tax Court concluded that it could not determine Santa Barbara's original basis in the Duplicatas. The Tax Court incorrectly stated that "[t]he only evidence related to basis are the 125 *duplicatas* and a spreadsheet prepared by Gramercy Advisors listing the *duplicatas*," which "[did] not provide enough information to determine the value of the *duplicatas* immediately before Santa Barbara contributed them to XBOXT." (SPA-8.) The Tax Court's conclusion ignored evidence in the record demonstrating that Santa Barbara's original basis in the Duplicatas was equal to their face value—namely: (1) Camargo's testimony that, based on his knowledge of Brazilian accounting principles and the evidence in the record, it appeared that Santa Barbara had maintained the Duplicatas at their original values until contributing them to XBOXT (A-1095); (2) the legal opinion of Brazilian counsel attesting to the validity and enforceability of the Duplicatas (A-660–61); and (3) Santa Barbara's representations in its Contribution Agreement to XBOXT that it had neither collected on the Duplicatas nor written down their value on its balance sheet (A-411–12).

*Third*, the Tax Court held that two of the partnership entities involved in the Investment Opportunity—XBOXT and PICCIRC—were not bona fide partnerships for federal tax purposes. Citing the test set forth in *Commissioner v. Culbertson*, 337 U.S. 733 (1949), for determining the validity of a partnership, the Tax Court stated—without any explanation—that there was "no evidence" that the partners of XBOXT and PICCIRC "endeavored to join in a common enterprise with a community of interest in profits and losses," and that the purported partners were simply "accomplices to the transaction[s]" at issue. (SPA-9.) In reaching this conclusion, the Tax Court notably did not consider: (1) Howard's testimony regarding his goals in investing with Gramercy (A-1570–74); (2) Murray's testimony regarding Gramercy's strong reputation for investing in foreign debt (A-1357, 1820); (3) Fishlow's and Camargo's testimony regarding the economic forces that made Brazilian distressed debt an attractive investment in 2002 (A-1097, 1641–43); or (4) the Operating Agreements for XBOXT or PICCIRC (A-436–55, 592–631).

*Fourth*, the Tax Court applied the so-called "anti-abuse rule," 26 C.F.R. § 1.701–2, to recast the transactions involved in the Investment Opportunity as a simple sale of the Duplicatas from Santa Barbara to Howard, which would have resulted in "[t]he parties' aggregate federal tax liability…be[ing] substantially higher." (SPA-11.) The Tax Court further concluded—without any basis in the

26

record—that: (1) "Santa Barbara had no risk of loss because XBOXT and PICCIRC had no activities besides the sale of tax shelters," and (2) "Santa Barbara had a nominal interest in XBOXT and no real participation." (SPA-11.) Under these circumstances, the Tax Court concluded that (unspecified) "partnerships" should be disregarded under the anti-abuse rule. (SPA-11.)

The Tax Court did not address the alternative bases asserted by the IRS for upholding the FPAA, including the application of anti-abuse doctrines like the economic substance doctrine, the form over substance doctrine, and the step transaction doctrine. (SPA-11.) Rather, it stated that it "[did] not need to address the arguments associated with these doctrines because [it] concluded that the transaction was a disguised sale and the partnerships were shams." (SPA-11.)

On April 24, 2024, the Tax Court entered a decision in favor of the IRS (SPA-13.) On July 18, 2024, Petitioner timely appealed from the Tax Court's Memorandum Opinion and its decision. (A-2056–59.)

## SUMMARY OF ARGUMENT

Each of the Tax Court's four bases for upholding the FPAA involved an incomplete view of the record, a misapplication of law, or both. *First*, the Tax Court erred in concluding that Santa Barbara's contribution of the Duplicatas to XBOXT was a disguised sale, based on the application of the disguised sale presumption under Treasury Regulation 1.707–3(c)(1). The Tax Court committed

27

reversible error when it relied on plainly inadmissible hearsay evidence to find the presumption applicable in the first instance. And even if the Tax Court properly applied the disguised sale presumption, it ignored ample evidence that rebutted the presumption by showing that Santa Barbara bore true entrepreneurial risk when it contributed the Duplicatas to XBOXT.

*Second*, the Tax Court erred in concluding that it could not determine Santa Barbara's tax basis in the Duplicatas when it contributed them to XBOXT. The record contained—and the Tax Court ignored—an opinion from a Brazilian law firm attesting to the validity of the Duplicatas, representations from Santa Barbara regarding the value of the Duplicatas, and expert testimony opining that all available evidence demonstrated that the Duplicatas were maintained at their original face values. This evidence was more than sufficient for the Tax Court to determine that Santa Barbara's original basis in the Duplicatas was equal to their face value.

*Third*, the Tax Court erred in concluding that XBOXT and the Partnership were not bona fide partnerships. Not only did the Tax Court fail to analyze *any* of the factors that this Court has deemed relevant to that inquiry, but it also ignored clear evidence in the record demonstrating that XBOXT and the Partnership were formed for a valid business purpose—including Howard's testimony regarding his

intent and testimony from Petitioner's experts regarding the potential profitability of the Duplicatas.

*Fourth*, the Tax Court erred by applying Treasury Regulation 1.701–2, the "anti-abuse rule," to invalidate the 2002 Deduction. The anti-abuse rule is plainly invalid, as it directs the IRS to ignore the plain text of the Code where it could be perceived to conflict with the supposed "intent of subchapter K." And even if the regulation were valid, it should not have been applied in this case, where the entities were bona fide partnerships and the partners agreed to share in the profits and losses of each partnership.

*Finally*, the Tax Court declined to address the IRS's alternative grounds for upholding the FPAA, which relied on the application of judicial anti-abuse doctrines. This Court should hold that such doctrines do not apply here, where the plain text of the Code and its statutory history demonstrate that the 2002 Deduction complied with the law then in effect. In the alternative, because the Tax Court did not even attempt to make the factual findings necessary to uphold the FPAA based on the IRS's alternative theories, should this Court determine that such anti-abuse doctrines could apply, it should remand for the Tax Court to decide those issues in the first instance.

## ARGUMENT

## I.     STANDARD OF REVIEW

This Court reviews the legal rulings of the Tax Court *de novo* and its factual

determinations for clear error.  *Scheidelman v. Comm'r*, 682 F.3d 189, 193 (2d Cir.

2012); *Callaway v. Comm'r*, 231 F.3d 106, 115 (2d Cir. 2000).

## II.    THE TAX COURT ERRED IN CONCLUDING THAT SANTA BARBARA'S CONTRIBUTION OF THE DUPLICATAS WAS A DISGUISED SALE

The Tax Court erred when it refused to treat Santa Barbara's contribution of

the Duplicatas to XBOXT as a valid partnership contribution subject to the

nonrecognition rule of Section 721, on the grounds that the contribution was in fact

a disguised sale.  (SPA-6–8.)  Not only did the Tax Court improperly apply a

presumption in favor of finding a disguised sale—which skewed its analysis and

inappropriately heightened Petitioner's burden—but it also ignored substantial

evidence rebutting that presumption.  Both of these errors warrant reversal.

### A.     Applicable Law

Section 707 of the Code provides that "[i]f a partner engages in a transaction

with a partnership other than in his capacity as a member of such partnership, the

transaction shall…be considered as occurring between the partnership and one who

is not a partner."  26 U.S.C. § 707(a)(1).  "Non-partnership-capacity transactions

include" a so-called "disguised sale," "in which a partner contributes property to a

30

partnership and soon thereafter receives a distribution of money or other consideration from the partnership." *Va. Historic Tax Credit Fund 2001 LP v. Comm'r*, 639 F.3d 129, 138–39 (4th Cir. 2011) (cleaned up); *see* 26 U.S.C. § 707(a)(2)(B). While a partnership contribution ordinarily does not trigger tax consequences, if a contribution is found to be a disguised sale, "the contribution is…treated as income" for the contributing partner. *BC Ranch II*, 867 F.3d at 556–57 & nn.33–34.

Treasury Regulation 1.707-3(b)(1) provides that a partner/partnership transaction constitutes a disguised sale "'if based on all the facts and circumstances,' '[t]he transfer of money or other consideration would not have been made but for the transfer of property' and, when the transfers are not simultaneous, 'the subsequent transfer is not dependent on the entrepreneurial risks of partnership operation.'" *Route 231, LLC v. Comm'r*, 810 F.3d 247, 253 (4th Cir. 2016) (quoting 26 C.F.R. § 1.707–3(b)(1)). The regulations further provide a non-exclusive list of ten relevant facts and circumstances "that may tend to prove the existence of a sale," including whether: (1) the subsequent transfer is certain at the time of the purported contribution; (2) the contributing partner is entitled to the subsequent transfer; (3) any person is obligated to provide money to the partnership to enable the subsequent transfer; and (4) the partnership has liquid assets. 26 C.F.R. § 1.707–3(b)(2)(i)–(x). The relevant facts and circumstances are

31

those "existing on the date of the earliest of such transfers"—that is, at the time of the contribution at issue. *Id.* As set forth below, *infra* 37–40, these factors weigh against a finding of a disguised sale here.

Treasury Regulation 1.707–3(c)(1) also creates a *presumption* that a disguised sale has occurred whenever "a partner transfers property to a partnership and the partnership transfers money or other consideration to the partner" within a two-year period. 26 C.F.R. § 1.707–3(c)(1). This presumption can only be overcome if "the facts and circumstances clearly establish that the transfers do not constitute a sale." *Id.* The facts and circumstances relevant to whether the presumption has been rebutted include the same ten factors listed under Treasury Regulation 1.707–3(b)(2). *See Va. Historic*, 639 F.3d at 143.

**B.** **The Tax Court Erred in Applying the Disguised Sale Presumption Under Treasury Regulation 1.707–3(c)(1)**

The Tax Court erred when it concluded that the disguised sale presumption under Treasury Regulation 1.707–3(c)(1) applied to Santa Barbara's contribution of Duplicatas to XBOXT. To reach this conclusion, the Tax Court made an inferential leap that a transfer of funds to Santa Barbara actually occurred within two years of Santa Barbara contributing the Duplicatas, based on: (1) a December 16, 2002 letter from Santa Barbara to XBOXT *requesting* a transfer; and (2) bank account statements purportedly showing that (a) Howard transferred $360,000 to a Gramercy-managed account on December 11, 2002, (b) an interest bearing account

for XBOXT was opened on December 20, 2002, (c) the XBOXT account received an internal transfer of $300,164 on December 23, 2002, and (d) at the end of January 2003, the XBOXT account had a balance of roughly $79. (SPA-4–5, 7; *see* A-642, 649, 651, 667.)

Of course, bank records of the sort relied on by the Tax Court as evidence of a transfer are inadmissible hearsay in the absence of a custodian's certificate. *See* Fed. R. Evid. 803(6)(D); *Mazzini v. Rep. of Arg.*, 282 F. App'x 907, 909 (2d Cir. 2008) (bank account statements admissible only with custodial letters); *Ianoe v. Comm'r*, T.C. Memo 2009-68, 2009 WL 791751, at *6 (2009) (bank account statements were "hearsay and so [could not] be admitted for the truth of their contents"). Thus, in response to a hearsay objection raised by Petitioner's counsel at trial, the IRS withdrew several *other* bank account statements and related wire transfer documents purportedly showing transfers from XBOXT to Santa Barbara. (*See* A-1967–68 (IRS withdrawing Exhibits 40-J, 41-J, and 43-J); A-658–59, 662 (withdrawn exhibits).) As the IRS's counsel conceded in the Tax Court, because the documents were being offered for their truth (to establish that the wire transfers occurred) they were inadmissible without a business records certification. (A-1961–69.) Although the Tax Court did not rule on Petitioner's objection (because the IRS obviated the issue by withdrawing the documents), it strongly indicated that it would not have admitted the documents without the required custodian

33

certification.  (*See* A-1967 (Tax Court stating that it "assumed that [the documents] were going to be covered by a certification from presumably Gramercy or possibly [the bank]").)

Despite indicating at trial that it had (correctly) concluded the bank records were inadmissible hearsay, in the Memorandum Opinion, the Tax Court nonetheless relied on other, equally inadmissible bank statements to trigger the disguised sale presumption.  In doing so, the Tax Court ignored the fact that *all* of the bank records offered by the IRS without a business records certification—not only the documents that the IRS ultimately withdrew—were plainly inadmissible hearsay.  The Tax Court therefore erred by relying on plainly inadmissible bank records to make its inferential leap that XBOXT transferred funds to Santa Barbara in January 2003, thereby triggering the disguised sale presumption.[7]

---

[7] Although the parties' discussion at trial only concerned certain exhibits, Petitioner's hearsay objection was sufficient to preserve the issue for appeal.  "The purpose of requiring a timely objection is to identify the disputed issue and give the trial judge a chance to correct errors which might otherwise necessitate a new trial."  *Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir. 1981).  Given the length and specificity of the parties' colloquy regarding the hearsay issue—and because the bank statements erroneously relied upon by the Tax Court were materially indistinguishable from the bank statement that was the subject of the colloquy— Petitioner's hearsay objection was properly preserved.  *See United States v. Cummings*, 858 F.3d 763, 772 (2d Cir. 2017).

Without the impermissibly relied upon bank statements, the only evidence in the record relating to the purported transfer of funds to Santa Barbara is Santa Barbara's December 16, 2002 letter to XBOXT. (*See* A-642.) That letter, however, merely *requested* that XBOXT transfer funds; it is not evidence that XBOXT actually *made* a transfer to Santa Barbara sufficient to trigger the disguised sale presumption under Treasury Regulation 1.707–3(c)(1).

The disguised sale presumption has been applied by courts only in a handful of cases, and in each, there was clear evidence in the record—or agreement by the parties—that the partnership had paid a contributing partner within two years of the relevant contribution. *See, e.g.*, *Route 231, LLC v. Comm'r*, T.C. Memo. 2014-30, 2014 WL 700397, at *14 (2014) (undisputed that there had been a transfer within the requisite two-year period), *aff'd* 810 F.3d 247; *Superior Trading, LLC v. Comm'r*, 137 T.C. 70, 83 n.13 (2011) (petitioner admitted that contributing partner "received cash for its…partnership interest…less than 10 months after transferring" property to the partnership), *aff'd* 723 F.3d 676 (7th Cir. 2013); *Va. Historic*, 639 F.3d at 143 (presumption applied because "the transfers undisputedly

_____

Moreover, even if the objection was not preserved, the Tax Court's reliance on the bank statements was plain error that affected Petitioner's substantial rights, *see* Fed. R. Evid. 103(e), because admitting and relying on the bank statements was "an obvious instance of misapplied law," *Latsis v. Chandris, Inc.*, 20 F.3d 45, 49 (2d Cir. 1994) (cleaned up), that proved integral to the Tax Court's application of the disguised sale presumption—its primary basis for upholding the FPAA.

occurred well within two years of one another").  Contrary to those cases, there is no admissible evidence in the record showing that Santa Barbara *ever* received a transfer from XBOXT—much less one within the two-year period necessary to trigger the disguised sale presumption.

The Tax Court's improper application of the presumption shifted to Petitioner the burden of clearly establishing "that there was no premeditated agreement that Santa Barbara would receive any distributions" when it contributed the Duplicatas to XBOXT on August 1, 2002.  (SPA-7.)  The Tax Court then concluded that Petitioner had failed to meet that burden, without analyzing the factors set forth in Treasury Regulation 1.707–3(b)(2) or otherwise considering whether Santa Barbara bore any entrepreneurial risk in XBOXT when it contributed the Duplicatas.  (SPA-7.)  In sum, the Tax Court's invocation of the presumption cut short its disguised sale analysis and allowed it to avoid considering "all the facts and circumstances" that existed when Santa Barbara contributed the Duplicatas.  *See* 26 C.F.R. § 1.707–3(b)(2).  This application of the disguised sale presumption, alone, therefore warrants reversal.

### C.  Even If the Disguised Sale Presumption Applied, the Partnership Has Clearly Established that Santa Barbara's Contribution Was Valid

Even if the IRS had presented admissible evidence that a transfer of funds to Santa Barbara occurred within two years of Santa Barbara's contribution, which it

36

did not, the Tax Court was still required to look at all of the facts and circumstances existing on the date of the original contribution—exemplified by the ten enumerated factors in Treasury Regulation 1.707–3(b)(2)—to determine whether Petitioner had rebutted the disguised sale presumption and whether "the subsequent transfer" to Santa Barbara "depende[d] on the entrepreneurial risks of partnership operations." 26 C.F.R. § 1.707–3(b)(1)(ii), (b)(2). The Tax Court, however, failed to consider any of the facts and circumstances related to Santa Barbara's contribution, instead stating summarily that Petitioner "failed to counter [the] facts" surrounding the supposed January 2003 payment to Santa Barbara. (SPA-7–8.) Contrary to the Tax Court's conclusory assertion, a majority of the factors listed in Treasury Regulation 1.707–3(b)(2) weigh *against* finding that a disguised sale occurred, and clearly establish that Santa Barbara's partnership contribution was legitimate.

At the time Santa Barbara contributed the Duplicatas to XBOXT:

- "[T]he timing and amount of [the] subsequent transfer" to Santa Barbara was not "determinable with reasonable certainty," *see* 26 C.F.R. § 1.707–3(b)(2)(i), because it was several months (from August to December 2002) before Howard agreed to participate in the Investment Opportunity, and provided the capital necessary for XBOXT to distribute funds to Santa Barbara (A-43–48);

- The Operating Agreement governing XBOXT did not entitle Santa Barbara to any subsequent payment in exchange for the Duplicatas or secure that payment, and in fact expressly disclaimed Santa Barbara's right to fixed returns and limited its right to withdraw any

37

contributions without Gramercy Investment's approval, *see* 26 C.F.R. § 1.707–3(b)(2)(ii)–(iii); (A-434–67);

- There is no evidence in the record that any other entity was legally obligated to make contributions or lend money to XBOXT such that XBOXT would be able to pay Santa Barbara for the Duplicatas, *see* 26 C.F.R. § 1.707–3(b)(2)(iv)–(v);

- There is no evidence in the record that XBOXT had any liquid assets at all, let alone the funds necessary to pay Santa Barbara for the Duplicatas, *see* 26 C.F.R. § 1.707–3(b)(2)(vii); and

- Because under XBOXT's Operating Agreement, Santa Barbara and Gramercy Investments agreed to share all losses, liabilities, debts, and expenses of XBOXT up to their relative membership interests (A-443), and as the 99% member of XBOXT, Santa Barbara bore the vast majority of the entrepreneurial risk associated with XBOXT and therefore did not shift the benefits or burdens of owning the Duplicatas to Gramercy Investments or any other entity, *see* 26 C.F.R. § 1.707–3(b)(2)(viii).

Thus, in contrast to other cases in which courts have found that a disguised sale occurred, there is no evidence here that, when Santa Barbara contributed the Duplicatas, it had any prearranged agreement with Gramercy (or any other entity) that it would be paid for those Duplicatas. *See, e.g.*, *Buyuk LLC v. Comm'r*, T.C. Memo. 2013-253, 2013 WL 5942309, at *24 (2013) (disguised sale existed where contributing partner "was promised payments equal to 5% of the face amount of the…receivables…upon BDO's successfully finding investors to pay for the receivables to be used in the structure"); *Route 231*, 810 F.3d at 258 (disguised sale existed where partnership operating agreements "contained a specific guarantee that [the contributing partner] would receive all tax credits it paid for and that it

38

would be entitled to reimbursement in cash for any shortfall"); *Va. Historic*, 639 F.3d at 145 (same, where contributing partner received the promise of "a fixed rate of return" and "a refund"). Instead, once Santa Barbara contributed the Duplicatas, those receivables belonged to XBOXT, and Santa Barbara stood to lose all value in the Duplicatas if Gramercy and BDO could not locate an investor or otherwise monetize the Duplicatas.

Similar factors present here have been found relevant to rebutting the disguised sale presumption. In *Claston, LLC v. United States*, No. 08 Civ. 48, 2012 WL 12953255 (D. N. Mar. I. Dec. 14, 2012), as in this case, a Brazilian entity contributed distressed Brazilian receivables to a partnership managed by Gramercy. *Id.* at *1. As the IRS alleges occurred here, in *Claston*, there was a subsequent transfer of funds to the contributing partner within a two-year window, thereby triggering the disguised sale presumption under Treasury Regulation 1.707–3(c)(1). *Id.* at *4. The IRS moved for summary judgment on several grounds, including that the partnership at issue was not bona fide, and that the Brazilian entity's contribution was a disguised sale. *Id.* at *5. The court denied the motion, finding that there was a genuine issue of material fact as to whether the disguised sale presumption had been rebutted in light of evidence that: (1) the Brazilian entity had forgone a direct sale of the receivables, and instead opted to contribute them with "an upside sharing" in the partnership; (2) there was no guarantee that

39

Gramercy would be able to monetize the receivables at the time they were contributed; and (3) the Brazilian entity inherently bore risk by contributing the receivables because, as with all debt instruments, they would become less valuable over time. *Id.* at *6. Each of these factors—in addition to the others discussed above, *see supra* 37–38—are present in this case, and they all lead to the conclusion that Santa Barbara's contribution of the Duplicatas was a genuine partnership contribution, not a disguised sale.

In sum, even if the Tax Court properly applied the disguised sale presumption under Treasury Regulation 1.707–3(c)(1)—which it did not— Petitioner has more than rebutted that presumption by clearly demonstrating that there was no predetermined agreement that XBOXT would pay Santa Barbara for the Duplicatas and that "there was [a] true entrepreneurial risk faced by [Santa Barbara] here." *Va. Historic*, 639 F.3d at 145. Because the Tax Court failed to consider *any* of the facts and circumstances relevant to the disguised sale inquiry, and because those facts ultimately show that a disguised sale did not occur, this Court should reverse the Tax Court's conclusory determination of this issue.

## III. THE TAX COURT ERRED IN CONCLUDING THAT IT COULD NOT DETERMINE SANTA BARBARA'S TAX BASIS IN THE DUPLICATAS

To establish the validity of the 2002 Deduction, Petitioner was required to establish that the Partnership's basis in the Duplicatas supported the full loss

deduction claimed. *See Scheidelman v. Comm'r*, 755 F.3d 148, 154 (2d Cir. 2014) (taxpayers ordinarily bear the burden of disproving IRS determinations, including determinations of value relevant to deductions). The Tax Court concluded that there was insufficient evidence in the record for it to determine Santa Barbara's tax basis in the Duplicatas at the time they were contributed to XBOXT—and, therefore, the tax basis that was ultimately passed through to the Partnership. (SPA-8.) The Tax Court, however, ignored ample evidence in the record (of the sort that other courts have found more than sufficient) establishing that Santa Barbara's basis in the Duplicatas was their face value.

Under Section 723 of the Code, "[t]he basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution," taking into account adjustments inapplicable here. 26 U.S.C. § 723. Under Sections 1011(a) and 1012, a partner's adjusted basis in property equals the cost of that property when it was acquired. 26 U.S.C. §§ 1011(a), 1012; *see Muserlian v. Comm'r*, 932 F.2d 109, 114 (2d Cir. 1991). In the case of property purchased with foreign currency, the basis of the property is the U.S. Dollar equivalent of the purchase price, based on the exchange rate in effect on the date of the original purchase. 26 U.S.C. § 988(b)(1)–(2); 26 C.F.R. § 1.988–1(a)(2)(ii). These principles apply to property contributed by a foreign entity even though that entity was not subject to federal

41

income tax at the time of contribution.  *See Ahadpour v. Comm'r*, 32 F. App'x 319, 321 (9th Cir. 2002) (citing *Gutwirth v. Comm'r*, 40 T.C. 666, 678–79 (1963)).

The cost of the Duplicatas to Santa Barbara—and therefore Santa Barbara's tax basis in the Duplicatas—at the time they were contributed was equal to their face value, which the parties agreed was 28,740,000 Brazilian Reals.  (A-43.) Translated to U.S. Dollars using the exchange rates in effect in 1996, when the Duplicatas were issued, this converts to $28,051,277.23.  (A-407.)

The Tax Court concluded that the "only evidence" in the record "related to basis" was the Duplicatas themselves (*see* A-111–404), along with a chart prepared by Gramercy showing their U.S. Dollar-equivalent value (*see* A-405–07).  That conclusion was incorrect.  In addition to the Duplicatas and Gramercy's conversion chart, Petitioner established the cost of the Duplicatas to Santa Barbara at the time they were contributed to XBOXT through:

- Camargo's expert report concluding that "[a]ll evidence suggests that the [Duplicatas] were maintained at their original values" when they were contributed to XBOXT (A-1095);

- A legal opinion from a Brazilian law firm, issued to XBOXT in January 2003, concluding that the Duplicatas were valid and sufficient to "provide a legal action against [Encol]" (A-660–61); and

- Santa Barbara's Contribution Agreement with XBOXT, in which Santa Barbara represented that, as of August 1, 2002: (1) the Duplicatas had not been sold or assigned; (2) Santa Barbara "report[ed] its income on the accrual method of accounting and accordingly ha[d] treated the entire face amount of [the Duplicatas] as proceeds from the sale of goods or services at the time the goods or

42

services were sold to the customers for Brazilian income tax and financial reporting purposes"; (3) Santa Barbara "had not written [the Duplicatas] down or off, nor made provision for bad debts with respect to [the Duplicatas] for its tax purposes"; and (4) the Duplicatas were still outstanding for their full face value (A-410–12).

The above evidence was more than sufficient for the Tax Court to determine that: (1) Santa Barbara's tax basis in the Duplicatas was their full face value; and (2) accordingly, this basis passed to XBOXT (and, ultimately, to the Partnership) in accordance with the nonrecognition rules of the Code. Indeed, other courts confronting similar facts and presented with comparable evidence have calculated the basis of receivables according to their recorded value by the contributing partner. *See Superior Trading*, 137 T.C. at 86–87 (deriving the tax basis of Brazilian receivables "from their reported value on [the contributor's] financial statements at the time of transfer"); *cf. Southgate Master Fund, LLC v. United States*, 651 F. Supp. 2d 596, 641 (N.D. Tex. 2009) (non-performing loans were not worthless, where contributing partner represented in its contribution agreement "that it had not written off any of the [non-performing loans]"), *aff'd* 659 F.3d 466.

The Tax Court clearly erred by failing to consider this additional evidence in the record demonstrating the tax basis of the Duplicatas when they were contributed to XBOXT. This Court should therefore reverse the Tax Court's conclusion that it could not determine Santa Barbara's basis in the Duplicatas and find that its basis supported the claimed deduction.

43

## IV. THE TAX COURT ERRED IN CONCLUDING THAT XBOXT AND PICCIRC WERE NOT BONA FIDE PARTNERSHIPS

The Tax Court erred when it summarily concluded that XBOXT and the Partnership were sham partnerships, without giving any consideration to Howard's trial testimony, the testimony of Petitioner's experts regarding the potential for profit in the Investment Opportunity, or the partners' agreements to share in the profits and losses of each of the partnerships, as set forth in the partnership operating agreements.

In *Commissioner v. Culbertson*, 337 U.S. 733 (1949), the Supreme Court articulated a totality-of-the-circumstances test for determining whether an entity is a bona fide partnership warranting treatment as such under the Code. Under *Culbertson*, a valid partnership exists when "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Id.* at 742. "This test turns on the fair, objective characterization of the interest in question upon consideration of all the circumstances." *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 (2d Cir. 2006). This Court has held that the following factors (the "*Luna* factors"), none of which are determinative, are relevant in applying the *Culbertson* test:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party had made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and co-proprietor…or whether one party was the agent or employee of

44

the other…; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented…that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Estate of Kahn v. Comm'r*, 499 F.2d 1186, 1189 (2d Cir. 1974) (quoting *Luna v. Comm'r*, 42 T.C. 1067, 1077–78 (1964)).

The Tax Court failed to analyze the *Luna* factors and therefore failed to consider the numerous factors that weighed in favor of finding that XBOXT and the Partnership were valid partnerships. *First*, in contrast to other cases in which partnerships have been found to be shams, XBOXT and the Partnership were both governed by Operating Agreements, which were executed by all partners (Santa Barbara, Gramercy Investment, Petitioner, and Tall Ships) upon their contribution of assets in exchange for partnership interests. (A-434–67, 538–77); *see, e.g.*, *Comtek Expositions, Inc. v. Comm'r*, 99 F. App'x 343, 346 (2d Cir. 2004) (no partnership agreement, written or oral); *Rovakat, LLC v. Comm'r*, T.C. Memo. 2011-225, 2011 WL 4374589, at *14 n.10 (2011) (same, as to one of the purported partnership entities); *Hall v. Comm'r*, T.C. Memo. 1993-198, 1993 WL 142899, at *5 (1993) (same). *Second*, as evidenced by the various contribution agreements, each of the relevant partners contributed property or other assets in exchange for partnership interests. (*See* A-408–21, 429–33, 477–83, 525–37, 578–84.) *Third*, pursuant to the Operating Agreements, each of the partners with an interest in

45

XBOXT and the Partnership agreed to share in the profits and losses of each of those partnerships in direct proportion to their partnership interest. (*See* A-443, 549–50.) *Fourth*, the evidence established that the Partnership both filed a federal partnership return (the return that is the subject of the FPAA) and maintained a financial statements in the name of the Partnership. (*See* A-933–59.)

In addition to the *Luna* factors, the Tax Court ignored Howard's testimony regarding the partners' good faith business purpose underlying the Investment Opportunity. As the tax matters partner of Petitioner—which held a 99% membership interest in the Partnership—Howard's intent was plainly relevant in assessing the Partnership's bona fides. Howard testified that he had substantial experience investing in distressed debt assets and that he was particularly interested in the Brazilian receivables managed by Gramercy because he wanted "to begin[] to get exposure" to distressed debt investments outside the U.S. market. (A-1570.) He further testified that he saw "significant upside" in the Investment Opportunity in light of Gramercy's "significant recoveries in the past," and understood he could be making a long-term investment. (A-1573, 1633.) The Tax Court's failure even to consider Howard's trial testimony regarding his intent constitutes error that, at the very least, requires remand for further factfinding. *See, e.g.*, *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124–25 (2d Cir. 2003).

The Tax Court also gave no apparent consideration to and made no factual findings regarding the expert testimony of Fishlow and Camargo, both of whom testified that, under the economic circumstances existing in Brazil in late 2002, it would have been reasonable for an investor to see value in the Duplicatas. (A-1004–21, 1046–60, 1643, 1704–06.) This value, in turn, gave rise to a reasonable expectation that XBOXT and the Partnership could generate profits—particularly in light of Gramercy's reputation for monetizing and recovering on foreign distressed debt (A-1357, 1820)—and therefore provides objective evidence of the bona fide business purpose of each of the partnerships that the Tax Court was required to consider. *See Broadwood Inv. Fund LLC v. United States*, 611 F. App'x 440, 441 (9th Cir. 2015) (reversing district court's finding that partnerships were not valid under *Culbertson* in light of evidence "project[ing] that the partnerships could be profitable" and the fact that "the partnerships allocated distributions, profits, and losses to partners *pro rata*").

Finally, it bears noting that the potential tax benefits of the Investment Opportunity to Howard do not render XBOXT or the Partnership invalid under *Culbertson*. *See Gilbert v. Comm'r*, 248 F.2d 399, 406 (2d Cir. 1957) (*Culbertson* and its progeny do not "hold that tax minimization is an improper objective of corporate management" (cleaned up)); *see also Southgate*, 659 F.3d at 484 (recognizing that tax considerations can play a role in partnership formation, so

47

long as they are not "the *only* reason for a partnership's formation"). As the Tax Court has previously recognized in refusing to invalidate a tiered partnership structure similar to that employed in this case: "if the facts show an objective of profiting from collection [on the assets managed by the partnership], even though that objective may be outweighed by investors' objective of realizing the benefit of substantial tax losses, the partnership should not be disregarded as a sham under *Culbertson*." *Peking Inv. Fund LLC v. Comm'r*, T.C. Dkt. No. 12772-09, ECF No. 115, at 6 (Feb. 12, 2018). Here, Howard's testimony establishes that at least one purpose of XBOXT, Petitioner, and the Partnership was to manage an investment in the Duplicatas on behalf of Howard—precisely the type of foreign distressed debt investment that had resulted in "significant recoveries" for Gramercy in the past (A-1573), and that was growing in popularity in late 2002 due to the economic conditions in Brazil. (A-1643, 1704–06.) This testimony—which the Tax Court entirely ignored—establishes that the partners of XBOXT and the Partnership shared a bona fide business purpose, and that those partnerships should not be held invalid under *Culbertson*.

## V. THE TAX COURT ERRED IN APPLYING THE ANTI-ABUSE RULE TO RECAST THE INVESTMENT OPPORTUNITY TRANSACTIONS

Perhaps the most troubling aspect of the Tax Court's decision was its reliance on Treasury Regulation 1.701–2, the "anti-abuse rule," to negate the straightforward tax consequences of the transactions at issue in this case. (SPA-

48

10–11.) The anti-abuse rule is plainly invalid, as it purports to permit the IRS to ignore the "literal words of a particular statutory or regulatory provision" if applying a statute or regulation as written would offend the supposed "intent of subchapter K." 26 C.F.R. § 1.701–2(b). But even if the anti-abuse rule were valid, it should not be applied in this case.

## A. The Anti-Abuse Rule Is Invalid

In evaluating the validity of a regulation, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). It is well-established that "[a] regulation that contravenes a statute is invalid." *United States v. Kahn*, 5 F.4th 167, 175 (2d Cir. 2021) (cleaned up).

The anti-abuse rule provides that "if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K," even if that transaction "may fall within the literal words of a particular statutory or regulatory provision," the IRS "can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K." 26 C.F.R. § 1.701–2(b).

49

Since its enactment in 1995, the anti-abuse rule has been subject to consistent criticism. *See Commentators Say Partnership Antiabuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 Tax Notes Today 175-28 (Aug. 18, 1995); *Willis* ¶ 1.05; William S. McKee et al., *Federal Taxation of Partnerships & Partners* ("*McKee*") ¶ 1.05[2][a] (perm. ed., rev. 2024). The reason for that criticism is apparent: contrary to black-letter law regarding the permissible scope of agency authority, the anti-abuse doctrine directs the IRS to *ignore* "the literal words of a particular statutory…provision" if applying the Code as written would conflict with "the intent of subchapter K." 26 C.F.R. § 1.701–2(b). This directive, of course, is paradoxical, as Congress's intent is expressed through the words in the statutes it enacts. *See Magwood v. Patterson*, 561 U.S. 320, 334 (2010); *Rep. of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).

As a purported source of authority for the anti-abuse rule, the IRS relied on 26 U.S.C. 7805. *See* Subchapter K Anti-Abuse Rule, 60 Fed. Reg. 18,741 (Apr. 13, 1995). That general grant of authority—far from inviting the IRS to ignore the literal words of the Code—merely provides that "the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a). As this Court has made clear, however, "a statute's general provision that an administrator may issue

such other regulations as he 'considers necessary' does not constitute authorization to issue a regulation that contradicts an express provision of the statute." *Kahn*, 5 F.4th at 173 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86–88 (2002)). Moreover, courts have not hesitated to invalidate Treasury regulations that have granted the IRS unfettered authority to disregard the text of the Code, where the regulation was promulgated pursuant to Section 7805 or a similar catch-all provision. *See RLC Indus. Co. v. Comm'r*, 58 F.3d 413, 417 (9th Cir. 1995) (invalidating regulation that vested discretion in IRS to disregard provisions of the Code in readjusting a taxpayer's blocks of timber as needed to reach a reasonable depletion allowance); *Edward L. Stephenson Tr. v. Comm'r*, 81 T.C. 283, 287, 294–95 (1983) (similar). The general grant of authority in Section 7805 therefore cannot salvage the anti-abuse rule.

Finally, it is notable that no court has *ever* upheld the anti-abuse rule when faced with a challenge to its validity, and that several courts have gone out of their way to avoid relying upon it. *See, e.g.*, *AD Global FX Fund, LLC v. United States*, No. 05 Civ. 223 (RKE), 2014 WL 1285503, at *4 n.9 (S.D.N.Y. Mar. 31, 2014); *Southgate*, 651 F. Supp. 2d at 657; *New Millenium Trading, LLC v. Comm'r*, T.C. Memo 2017-9, 2017 WL 89130, at *11 n.18 (Jan. 10, 2017). Moreover, even the IRS has withdrawn reliance on the anti-abuse rule in previous litigation after its validity was challenged. *See McKee* ¶ 1.05 (citing *Jade Trading, LLC v. United*

51

*States*, 60 Fed. Cl. 558 (2004)). And internal IRS guidance makes clear that, due to the anti-abuse rule's "broad authorization to recast transactions to reflect the intent of Subchapter K," IRS examiners must obtain approval from the National Office before relying on the rule "to ensure fair and consistent application of the regulations." Internal Revenue Service, U.S. Dep't of Treasury, *Internal Revenue Manual* § 4.32.2.15(1) (rev. 2018).

In sum, the anti-abuse rule is expressly anti-textual, grants the IRS free reign to disregard partnership transactions that comply with the Code, and is completely unpredictable in its application—so much so that IRS examiners must obtain National Office approval before relying on it. Nothing in the Code authorizes the IRS to exercise such broad powers. As such, the anti-abuse rule is invalid, and the Tax Court erred by applying it in this case.

### B. Even If the Anti-Abuse Rule Is Valid, It Is Inapplicable

Even if the anti-abuse rule had been validly promulgated, it should not have been applied by the Tax Court to recast the transactions making up the Investment Opportunity.

As defined in the anti-abuse rule, "[i]mplicit in the intent of subchapter K are the following requirements":

> (1) The partnership must be bona fide and each partnership transaction or series of related transactions…must be entered into for a substantial business purpose.

(2)     The form of each partnership transaction must be respected under substance over form principles.

(3)     …[T]he tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income….

26 C.F.R. § 1.701–2(a).

Under this definition, the transactions carried out by XBOXT, Petitioner, and the Partnership clearly complied with the supposed "intent" of subchapter K. As discussed above, each of the three partnership entities was "bona fide," and the transactions were carried out "for a substantial business purpose," as the Investment Opportunity was designed to: (1) secure the Duplicatas as part of a pool of assets that could be invested in by individuals located by Gramercy; and (2) manage Howard's investment in the Duplicatas on his behalf. *See supra* 7–8. The substance and form of those transactions also properly reflected "the partners' economic agreement" and each "partner's income," as: (1) each partnership was formed and managed pursuant to the Operating Agreements, and only after each partner made a valid contribution of assets to the partnership, *see supra* 9–12; and (2) the losses reported by the Partnership and allocated to Petitioner were not only permitted, but *required* by the Code provisions in effect in 2002, *see infra* 56–59.

In addition, the anti-abuse rule provides a list of illustrative factors which may demonstrate that a transaction contravenes the "intent" of subchapter K,

53

including that "one or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities…or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital." 26 C.F.R. § 1.701–2(c)(3). The Tax Court relied heavily on this factor in applying the anti-abuse rule, stating—without any basis in the record—that "Santa Barbara had no risk of loss because XBOXT and [the Partnership] had no activities besides the sale of tax shelters," and that "Santa Barbara had a nominal interest in XBOXT and no real participation." (SPA-11.) Both of these conclusions are demonstrably incorrect. As discussed above, *supra* 37–40, Santa Barbara had true entrepreneurial risk because it had no promise of interest or return on its contribution to XBOXT, and because it risked losing the value of the Duplicatas after that contribution. Moreover, it cannot be said that Santa Barbara had only a "nominal interest" in XBOXT, where: (1) Santa Barbara had a *99% membership interest* in XBOXT; and (2) even after XBOXT contributed 104 of the Duplicatas to Petitioner, 21 Duplicatas (with a face value of over $5 million) remained with XBOXT. (A-43–44, 405–07, 419–21.)

Accordingly, even if it were proper for the Tax Court to invoke the anti-abuse rule, its application of that rule involved the same flawed and cursory analysis as the remainder of the Memorandum Opinion.

## VI.  THE ANTI-ABUSE DOCTRINES INVOKED BY THE IRS BELOW ARE INAPPLICABLE

In addition to the legal theories discussed above, the IRS argued below that the Partnership's 2002 Deduction should be invalidated under several judicially created anti-abuse doctrines—namely, the economic substance doctrine, the substance over form doctrine, and the step transaction doctrine.  Petitioner argued that none of these doctrines should be applied in this case because the Partnership strictly complied with the applicable Code provisions in effect in 2002.  (SPA-11.)  The Tax Court avoided this issue entirely by declining to address any of the IRS's alternative bases for upholding the FPAA in light of its conclusions regarding the disguised sale rules and the invalidity of the partnerships.  (SPA-11.)  This was error: the Tax Court should have rejected outright the application of any anti-abuse doctrines to the 2002 Deduction.

As this Court has explained, the anti-abuse doctrines should be understood as "tool[s] of statutory construction, not of punitive enforcement."  *Benenson v. Comm'r*, 910 F.3d 690, 702 (2d Cir. 2018).  In other words, they should not be applied in a way that "tak[es] a transaction entirely outside its statutory framework"—supplanting statutory language—but instead solely as a means of

55

helping courts construe the "technical language" of the Code to harmonize it with the overall structure of the complicated tax system Congress enacted. *See Benenson v. Comm'r*, 887 F.3d 511, 517 (1st Cir. 2018) (cleaned up). This Court has therefore declined to apply the anti-abuse doctrines to invalidate tax deductions that strictly comply with the framework enacted by Congress and do not "distort[]" the purposeful "tax incentive[s]" supplied by that framework. *See Benenson*, 910 F.3d at 700–01 (refusing to apply the substance over form doctrine and the step transaction doctrine).

As discussed above, *supra* 12–14, the provisions of the Code in effect in 2002 not only permitted, but *required*, the Partnership to recognize the built-in loss of the Duplicatas when they were sold. That was no accident. In 1984, Congress revised Section 704(c) of the Code to require that, when contributed property with a built-in gain or loss is sold by a partnership, the gain or loss must be allocated to the contributing partner if they are still a member of the partnership. *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 71, 98 Stat. 494, 589 (1984). Congress recognized, however, that the 1984 legislation left open the issue of how a built-in gain or loss should be recognized if the contributing partner had transferred his partnership interest before the contributed property was sold. *See* H.R. Rep. No. 98-861 at 857 (1984) (Conf. Rep.).

56

That open issue was squarely addressed in 1989, when Congress enacted Section 704(c)(3) of the Code, which *requires* successor partners to stand in the shoes of contributing partners in all respects, including when recognizing built-in gains and losses from contributed property. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, § 7642, 103 Stat. 2106, 2379–80 (1989); H.R. Rep. 101-247 at 1357 (1989); S. Rep. No. 101-56 at 197 (1989). This result was reinforced by Treasury Regulation 1.704–3(a)(7), which provides that, if a contributing partner transfers a partnership interest before the contributed property is sold, built-in gains or losses "must" be allocated to the transferee partner. 26 C.F.R. § 1.704–3(a)(7).

Under the Code provisions in 2002, the Partnership thus had no choice but to recognize the 2002 Deduction after the Duplicatas were sold, because the built-in losses in the Duplicatas passed from Santa Barbara, to XBOXT, to Petitioner, and ultimately to the Partnership. This was not some sort of "distortion of the tax code" requiring application of the anti-abuse doctrines, *see Benenson*, 910 F.3d at 702, but a straightforward application of the partnership property contribution provisions that Congress had carefully crafted over several years and multiple pieces of legislation.

Indeed, the lawful nature of the 2002 Deduction is reinforced by legislation enacted *after* the transactions at issue here, which was intentionally designed to

alter the way in which built-in losses are recognized by partners other than original contributing partners. As part of the American Jobs Creation Act of 2004 (the "AJCA"), Congress amended the Code to curtail the shifting of built-in loss from a contributing partner to successor partners. *See* Pub. L. No. 108-357, § 833(a)–(b), 118 Stat. at 1589. The Conference Report accompanying the AJCA explained that, under the law prior to 2004, "[t]here [was] no specific guidance preventing the allocation of [a] built-in loss to the remaining partners" when a contributing partner transferred its partnership interest. H.R. Rep. No. 108-755, at 622 (2004) (Conf. Rep.). It thus "appear[ed]" to Congress "that losses [could] be 'transferred' to other partners where the contributing partner no longer remain[ed] a partner." *Id.* Accordingly, the statutory changes effected by the ACJA were "intended…to prevent shifting a built-in loss from a tax indifferent foreign entity to a U.S. taxpayer through the use of a partnership." *Superior Trading*, 137 T.C. at 79.

At the time the Partnership carried out the Investment Opportunity, however, the AJCA amendments had not yet been enacted, and they were not made retroactive. *See* Pub. L. No. 108-357, § 833(d), 118 Stat. at 1592. The fact that Congress passed legislation with the express purpose of altering the federal tax implications of transactions like the ones at issue in this case is powerful evidence that the 2002 Deduction was proper when it was recognized. *See N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 221 n.23 (2d Cir. 2021).

58

In light of the clear statutory history, this Court should hold that the IRS cannot rely on the anti-abuse doctrines to, in effect, achieve retroactive application of the AJCA amendments and "avoid textual consequences [it] doesn't like." *Benenson*, 910 F.3d at 699 (cleaned up).

## VII.  IF ANY ANTI-ABUSE DOCTRINES COULD APPLY, REMAND IS NECESSARY

If this Court concludes that any anti-abuse doctrines could potentially apply in this case, it should remand for the Tax Court to apply those doctrines in the first instance.

Each of the alternative theories set forth in the FPAA require additional factfinding that the Tax Court did not provide, including a consideration of: (1) Howard's trial testimony regarding the partners' subjective intentions and expectations with respect to the Investment Opportunity (A-1569–1623, 1633–34); (2) whether there was a prearranged plan pursuant to which the Partnership would sell the Duplicatas, despite Howard's testimony that he did not direct and was unaware of the Partnership's sale of the Duplicatas at the time they were sold (A-1583); (3) expert testimony regarding the value of the Duplicatas (A-1641–42, 1704–06); and (4) Howard's testimony regarding the value of the Duplicatas, which the Tax Court admitted in light of Howard's investment experience (A-1566–67). *See Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 119 (2d Cir. 2015) (consideration of economic substance doctrine requires analyzing the

taxpayer's subjective intent); *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994) (step transaction doctrine requires determining whether there was a "prearranged plan" to trigger the end tax result as if it were a "single transaction"); *Buyuk*, 2013 WL 5942309, at *15–18 (conducting detailed factual inquiry, including an evaluation of expert testimony, in determining the value of receivables contributed to a partnership).

Because the Tax Court did not make any of the requisite factual findings or analyze the IRS's alternative theories for upholding the FPAA, if this Court concludes that any of the anti-abuse doctrines could apply, it should remand to the Tax Court for further analysis. *See Scheidelman*, 682 F.3d at 199 (remanding for further proceedings where Tax Court had not determined IRS's alternative arguments in the first instance).

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the Tax Court's decision or, in the alternative, vacate and remand for further proceedings.

Dated:     October 31, 2024
           New York, New York

> MORVILLO ABRAMOWITZ GRAND IASON
>     & ANELLO P.C.
>
> By:     _/s/ Jeremy H. Temkin_
>         Jeremy H. Temkin
>         Edward M. Spiro
>         Christian B. Ronald
>         565 Fifth Avenue
>         New York, New York 10017
>         (212) 856-9600
>         jtemkin@maglaw.com
>         espiro@maglaw.com
>         cronald@maglaw.com
>
> *Attorneys for Petitioner-Appellant*
>     *PIMLICO LLC*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,999 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:     October 31, 2024
           New York, New York

By:     */s/ Christian B. Ronald*
        Christian B. Ronald

# SPECIAL APPENDIX

i

**TABLE OF CONTENTS**
**SPECIAL APPENDIX**

**Page**

Memorandum Findings of Fact and Opinion of the
    United States Tax Court, dated April 22, 2024 ...... SPA-1

Decision of the United States Tax Court, dated
    April 24, 2024 ........................................................ SPA-13

$$\boxed{\text{SPA-1}}$$

75

# United States Tax Court

T.C. Memo. 2024-50

PICCIRC, LLC, PIMLICO, LLC, A PARTNER OTHER THAN THE
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 4308-12.                    Filed April 22, 2024.

————————

*Donald M. Lund*, *Michael A. Metcalfe*, *Gabriel G. Tsui*, and *Steven Gary Chill*, for petitioner.

*Thomas J. Kerrigan*, *Andrew K. Lee*, *Theodore Robert Leighton*, and *Joshua Nachman*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: This case is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, § 402(a), 96 Stat. 324, 648.[1]  In a notice of final partnership administrative adjustment (FPAA), respondent disallowed a $22,718,351 ordinary loss deduction that PICCIRC, LLC (PICCIRC), claimed on its 2002 Form

————————

[1] Before its repeal for taxable years beginning after December 31, 2017, TEFRA, codified at sections 6221 through 6234, prescribed procedures for audit and litigation concerning returns filed by partnerships.  Respondent followed these procedures in this case.  Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**Served 04/22/24**

SPA-2

2

[*2] 1065, U.S. Return of Partnership Income, in connection with the sale of distressed Brazilian trade receivables. Respondent adjusted the partnership's basis in the receivables to zero and determined that accuracy-related penalties under section 6662 applied to any underpayments of tax attributable to the disallowance. PIMLICO, LLC (PIMLICO or petitioner), a partner other than the tax matters partner of PICCIRC, timely filed a Petition for review under section 6226. We sustain respondent's determinations concerning the loss deductions and penalties, as set forth below.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and its Exhibits are incorporated herein by this reference. PICCIRC's principal place of business was Greenwich, Connecticut. PICCIRC's tax matters partner is Tall Ships Capital Management, LLC (Tall Ships). Petitioner's principal place of business was in New York when the Petition was timely filed. PIMLICO's tax matters partner is John D. Howard.

*Overview*

This case concerns the tax treatment of a structured distressed debt investment transaction (transaction) involving transfers of distressed foreign trade receivables through several purported domestic partnerships. Three parties were centrally involved in the transaction: (1) BDO Seidman, LLP (BDO), a professional services firm providing accounting, tax, financial, and consulting services, that marketed the transaction; (2) Mr. Howard, who invested in the transaction; and (3) Gramercy Advisors, LLC (Gramercy Advisors), an investment advisory firm, that implemented the transaction on Mr. Howard's behalf.

The receivables involved in the transaction originated with Santa Bárbara Indústria e Comércio de Ferro Ltda. (Santa Barbara), a metal products supplier organized under the laws of Brazil. The receivables consisted of *duplicatas*,[2] i.e., orders for payments, issued by Santa Barbara in 1996 to Encol S/A Engenharia Comércio e Indústria (Encol), a real estate development and construction company organized under the laws of Brazil. Encol purchased products from Santa Barbara on

---

[2] Under Brazilian law, *duplicatas* are orders for payments issued by the creditor against the debtor related to the sales of goods or services that are evidenced by an invoice.

SPA-3

3

**[*3]** credit. Santa Barbara billed the trade receivables to Encol when it purportedly delivered goods to Encol in the ordinary course of business.

In 1997 Encol filed for bankruptcy protection. A Brazilian bankruptcy court granted Encol's petition, preventing adjudication of bankruptcy so long as Encol satisfied certain conditions concerning repayment of its creditors, and appointed a trustee to oversee the process. After Encol failed to meet the court's stated conditions by the end of 1998, the trustee recommended that the court declare Encol bankrupt. The court did so in 1999 and directed the liquidation of its assets.

On August 1, 2002, Santa Barbara contributed the Encol receivables using a tiered partnership structure. First, Gramercy Advisors and Santa Barbara formed XBOXT, LLC (XBOXT).[3] Santa Barbara contributed the Encol receivables in exchange for a 99% interest in XBOXT. Gramercy Advisors owned the remaining 1% membership interest. Second, XBOXT and Tall Ships, a limited liability company affiliated with Gramercy Advisors, formed PIMLICO. XBOXT contributed the majority of its Encol receivables to PIMLICO in exchange for a 99% membership interest, and Tall Ships acquired the remaining 1% interest.

Next, Mr. Howard became involved. He had significant investment experience including investments in distressed assets. In 2002 BDO approached Mr. Howard to pitch the distressed debt structure. BDO discussed with him tax benefits—including specific tax losses—that could be obtained through the transaction.

On December 10, 2002, Mr. Howard entered into a consulting agreement with BDO with respect to the transaction. Mr. Howard agreed to pay BDO a consulting fee of $865,000, while BDO agreed to provide Mr. Howard with an opinion letter concerning the federal income tax consequences of the transaction. BDO issued the opinion letter, dated October 15, 2003, to Mr. Howard.

Through BDO, Mr. Howard was introduced to Gramercy Advisors. On December 3, 2002, Mr. Howard entered into an investment management agreement with Gramercy Investment Management, LLC, an affiliate of Gramercy Advisors, with respect to an investment of $360,000.

---

[3] XBOXT was a limited liability company (LLC) formed under Delaware law.

4

**[*4]**  On December 11, 2002, Mr. Howard transferred $360,000 to an account at Boston Safe Deposit & Trust Co. (Boston Trust) managed by Gramercy Advisors for the benefit of Mr. Howard.  On that same day, Mr. Howard acquired an 89.10% membership interest in PIMLICO from XBOXT in exchange for $300,164.  An interest-bearing account for XBOXT at Boston Trust was opened on December 20, 2002.  On December 23, 2002, an internal transfer (i.e., from another Boston Trust account) of $300,164 was made into the XBOXT account.  After Mr. Howard's acquisition of his interest, PIMLICO's three members were Mr. Howard with an 89.10% interest, XBOXT with a 9.9% membership interest, and Tall Ships with a 1% interest.

PIMLICO and Tall Ships formed PICCIRC, a limited liability company under Delaware law.  On December 11, 2002, PIMLICO contributed 104 of the Encol receivables valued at Brazilian real 23,585,000 to PICCIRC for a 99% ownership interest.  Tall Ships contributed 0.1871% participation interests in two promissory notes for $900 each in exchange for 1% interest in PICCIRC.  RSK Investments, LLC, and Wester Gailes Capital Management, LLC, issued the notes.  The PICCIRC operating agreement valued the PIMLICO capital contribution at $333,335 and Tall Ships' contribution at $3,376.

On December 13, 2002, Mr. Howard entered into an Investment Advisory Services Fee Agreement with Mead Point Capital Management LLC (Mead Point), an affiliate of Gramercy Advisors that collects fees with respect to its separately managed accounts.  Under the terms of the agreement, Mr. Howard agreed to pay Mead Point a one-time fee of $59,836 with respect to the transaction.  (This figure represented the balance of the $360,000 Mr. Howard initially transferred to his account at Boston Trust after his payment to XBOXT of $300,164 for his PIMLICO interest.)

On December 26, 2002, PICCIRC sold all its Encol receivables to an affiliate of Gramercy Advisors, Gramercy Financial Services, LLC, for $357,144.  Mr. Howard was not aware of the sale by PICCIRC of its Encol receivables to Gramercy Financial Services, LLC.

On January 16, 2003, Gramercy Advisors received a facsimile copy of a letter, dated December 16, 2002, from Santa Barbara requesting a withdrawal of $300,164 of its membership interest in XBOXT and its payment to an account at Hudson United Bank for

5

**[\*5]** Kiesser Investments, SA.[4] XBOXT's account at Boston Trust, which had received a transfer of $300,164 on December 23, 2002, had a closing balance of $79 on January 30, 2003.

On January 21, 2003, Tojal Renault Advogados Associados issued a legal opinion related to the validity and enforceability of the assignment of the Encol receivables by Santa Barbara to XBOXT. This document represented that Santa Barbara had the necessary authority to perform its obligations.

On February 27, 2003, Proskauer Rose, LLP, sent a representation letter to Mr. Howard confirming that the firm would represent him in reviewing the tax consequences of the transaction. Pursuant to the representation agreement, Mr. Howard agreed to pay a fixed fee of $100,000.[5] On June 13, 2003, Mr. Howard executed a copy of the representation letter, agreeing to and accepting the terms set forth therein. Proskauer Rose issued a tax opinion letter, dated October 13, 2003, to Mr. Howard with respect to the transaction. The opinion letter represented that the transaction had the requisite economic substance and business purposes to be respected under the authorities discussed in the opinion letter.

On October 15, 2003, BDO issued a tax opinion letter to Mr. Howard. The opinion letter represented that no penalty should apply to the transaction pursuant to section 6662(b)(2) or (3).

On its Form 1065 for taxable year 2002, PICCIRC reported an ordinary loss of $22,718,351 from the transaction. This purported ordinary loss from the transaction was allocated to PIMLICO. Mr. Howard's share of the purported loss from the transaction was $20,446,516. He claimed flow-through ordinary loss deductions of $14,506,070 and $6,118,531 from PIMLICO for the taxable years 2002 and 2004, respectively.

---

[4] This letter was identical to a sample draft letter that Gramercy Advisors had sent to Santa Barbara, except with respect to the designation of the account to which the withdrawn funds were to be sent.

[5] On June 20, 2003, Mr. Howard paid $75,000 of this fee. On October 13, 2003, Proskauer Rose invoiced Mr. Howard for the remaining $25,000, which he paid on October 15, 2003.

6

[*6]                                  OPINION

I.    *Burden of Proof*

Generally, the Commissioner's determinations set forth in an FPAA are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Petitioner did not contend that the burden of proof should shift to respondent under section 7491(a).

II.   *Disguised Sale*

In general, partners may contribute capital to a partnership tax free and may receive a tax-free return of previously taxed profits through distributions to the extent that a distribution does not exceed adjusted basis. *See* §§ 721, 731. These nonrecognition rules do not apply, however, where the transaction is found in substance to be a disguised sale of property. *See Jacobson v. Commissioner*, 96 T.C. 577 (1991), *aff'd per curiam*, 963 F.2d 218 (8th Cir. 1992).

A disguised sale occurs where a partner contributes property to a partnership and receives a related distribution that is, in effect, consideration for the contributed property. *See* § 707(a)(2)(B); *Canal Corp. & Subs. v. Commissioner*, 135 T.C. 199, 210–11 (2010); Treas. Reg. § 1.707-3. A transaction may be deemed a disguised sale if, on the basis of all the facts and circumstances, (1) the partnership's transfer of money or other consideration to the partner would not have been made but for the partner's transfer of property and (2) if the transfers were not made simultaneously, the subsequent transfer was not dependent on the entrepreneurial risks of partnership operations. Treas. Reg. § 1.707-3(b)(1); *see also Route 231, LLC v. Commissioner*, 810 F.3d 247, 253 (4th Cir. 2016), *aff'g* T.C. Memo. 2014-30. The regulations provide that transfers between a partnership and a partner within a two-year period are presumed to be a sale of property to the partnership unless the facts and circumstances "clearly establish" otherwise. Treas. Reg. § 1.707-3(c)(1); *see Superior Trading, LLC v. Commissioner*, 728 F.3d 676, 681 (7th Cir. 2013) (finding the presumption triggered where the partner received a substantial distribution 10 months after contributing distressed receivables), *aff'g* 137 T.C. 70 (2011), *supplemented by* T.C. Memo. 2012-110. "This presumption places a high burden on the partnership to establish the validity of any suspect partnership

SPA-7

7

[*7] transfers." *Va. Historic Tax Credit Fund 2001 LP v. Commissioner*, 639 F.3d 129, 139 (4th Cir. 2011), *rev'g* T.C. Memo. 2009-295.

Petitioner contends that the transaction is not a disguised sale. In particular, petitioner argues that the record contains no evidence of a distribution to Santa Barbara within two years of its contribution of the Encol receivables. We disagree.

The timeline for the transaction is far less than two years. On August 1, 2002, Santa Barbara contributed the receivables to XBOXT. On December 16, 2002, Santa Barbara requested a withdrawal from XBOXT of $300,164. The withdrawal Santa Barbara requested is the same amount Mr. Howard paid to acquire an 89.10% interest in PIMLICO from XBOXT on December 11, 2002. Given that XBOXT had received a transfer of $300,164 into an interest-bearing account on December 23, 2002, but had a balance in that account of only $79 on January 30, 2003, we are satisfied that the $300,164 requested by Santa Barbara on December 16, 2002, was in fact paid from the XBOXT account sometime between December 23, 2002, and January 30, 2003.

The above facts do not appear to be coincidental. The facts and circumstances existing on the date of the earliest transfer are generally the relevant ones to be considered. Treas. Reg. § 1.707-3(b)(2). Petitioner has the burden of proving that there was no premeditated agreement that Santa Barbara would receive any distributions. The circumstances surrounding Santa Barbara's partial redemption of its XBOXT interest suggest that it was a preconceived step to shift basis to Mr. Howard.

The payment to Santa Barbara was not paid out of operational profits but rather from the proceeds of Mr. Howard's subsequent acquisition of an interest in PIMLICO from XBOXT. The redemption and acquisition are for the same amount. Mr. Howard's acquisition was made five days before the date on the Santa Barbara redemption letter. The purpose of the redemption was to trigger the section 704(c) loss allocation rule for the benefit of Mr. Howard. The dates and account activity of the partnerships match to such an extent that it becomes clear that XBOXT was formed solely as a conduit to execute a disguised sale of the Encol receivables.

Petitioner has offered no alternate explanation for this account activity or posited where more than $300,000 in funds went between December 23, 2002, and January 30, 2003. Petitioner has failed to

8

**[\*8]** counter these facts and has failed to meet its burden of proof. Therefore, the transaction is a disguised sale. Accordingly, we sustain respondent's disallowance of PICCIRC's claimed loss deduction to the extent that the claimed loss exceeds the transferred basis from XBOXT (via PIMLICO) in the Encol receivables.

III. *Basis in Encol Receivables*

Pursuant to section 723, the basis of property contributed to a partnership by a partner shall be the partner's adjusted basis at the time of the contribution. In other words, the basis equals the basis the asset had in the hands of the contributing partner. Santa Barbara purportedly transferred the Encol receivables to XBOXT as the first step in the transaction.

The only evidence related to basis are the 125 *duplicatas* and a spreadsheet prepared by Gramercy Advisors listing the *duplicatas*. These documents do not provide enough information to determine the value of the *duplicatas* immediately before Santa Barbara's contribution of them to XBOXT. Therefore, we cannot determine the basis in the Encol receivables.

IV. *Validity of Partnerships*

A partnership exists for federal income tax purposes when parties intend to join together in the conduct of a trade or business and to share in the profits or losses of that trade or business. *Commissioner v. Tower*, 327 U.S. 280, 286 (1946). Whether a partnership is respected for federal tax purposes depends upon whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). To form a bona fide partnership, the parties "must have two intents: (1) the intent to act in good faith for some genuine business purpose and (2) the intent to be partners, demonstrated by an intent to share 'the profits and losses.'" *Chemtech Royalty Assocs., LP v. United States*, 766 F.3d 453, 461 (5th Cir. 2014); *see also Commissioner v. Culbertson*, 337 U.S. at 741–43; *Commissioner v. Tower*, 327 U.S. at 286–87; *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 483–84 (5th Cir. 2011). In determining whether a bona fide partnership has been formed, we must consider all relevant facts and circumstances, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties,

9

[*9] their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent." *Commissioner v. Culbertson*, 337 U.S. at 742.

All the partnerships involved in this transaction were LLCs created under Delaware law. Pursuant to the check-the-box regulations under Treasury Regulation § 301.7701-3(b)(1), an LLC is classified as a partnership by default unless it elects to be classified as a corporation. This regulation does not entitle a partnership to the benefits provided by the Code to partnerships. *Superior Trading, LLC v. Commissioner*, 728 F.3d at 681.

There is no evidence that Santa Barbara and Gramercy Advisors, partners of XBOXT, endeavored to join in a common enterprise with a community of interest in profits and losses. The purported partners were accomplices to the transaction. The same is also true for PICCIRC. There is no evidence that PICCIRC, PIMLICO, and Tall Ships were engaged in business together.

The abundance of "abusive tax-avoidance schemes . . . designed to exploit the Code's partnership provisions" requires that "our scrutiny of the taxpayer's choice to use the partnership form [be] especially stringent." *Southgate Master Fund*, 659 F.3d at 483–84. A partnership need not be respected "merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective." *TIFD III-E, Inc. v. United States* (*Castle Harbour*), 459 F.3d 220, 232 (2d Cir. 2006). Rather, the parties' reasons for choosing the partnership form "must, on balance, display good 'common sense from an economic standpoint.'" *Southgate Master Fund*, 659 F.3d at 484 (quoting *Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003)). Even where a partnership engages in transactions having economic substance, the parties' choice to operate as a partnership must be for "a legitimate, profit-motivated reason," *id.*, and "the absence of a nontax business purpose is fatal," *ASA Investerings P'ship v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000), *aff'g* T.C. Memo. 1998-305; *see also Castle Harbour*, 459 F.3d at 231–32; *Andantech L.L.C. v. Commissioner*, 331 F.3d 972, 980 (D.C. Cir. 2003), *aff'g in part and remanding* T.C. Memo. 2002-97; *Merryman v. Commissioner*, 873 F.2d 879, 881 (5th Cir. 1989), *aff'g* T.C. Memo. 1988-72.

SPA-10

10

**[\*10]** The partnership antiabuse rules provide that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K. Treas. Reg. § 1.701-2. Pursuant to these rules, a partnership satisfies the general antiabuse rule if it meets three conditions: (1) the partnership is bona fide and each partnership transaction or series of transactions is entered into for a substantial business purpose; (2) each partnership transaction is respected under substance over form principles; and (3) the tax consequences to each partner must accurately reflect the partners' economic agreement unless deviation therefrom is clearly contemplated by subchapter K. *Id.* para. (a). Where a partnership is formed to facilitate a transaction a principal purpose of which is to produce tax consequences inconsistent with the intent of subchapter K, the Commissioner may recast partnership transactions to achieve tax results intended by subchapter K. *Id.* para. (b). The Commissioner has broad authority to disregard the partnership to justify or modify the claimed tax treatment.

Whether a partnership satisfies the antiabuse regulation is determined on the basis of all of the facts and circumstances. *Id.* para. (c). The regulation provides a list of illustrative factors that may indicate a disregard for the intent of subchapter K. *Id.* para. (c). The factors relevant to this case include the following: (1) the present value of the aggregate federal tax liability of the partners is substantially less than if the partners had owned the partnership's assets and conducted the partnership's activities directly; (2) the present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions designed to achieve a particular end result were integrated and treated as steps in a single transaction; and (3) one or more partners who are necessary to achieve the claimed tax results have a nominal interest in the partnership and are substantially protected from any risk of loss from the partnership's activities. *Id.*

Relevant to the first two factors listed above is that if Mr. Howard had purchased the assets directly from Santa Barbara, PICCIRC's basis in the receivables at the time of the sale that produced the losses would have been significantly lower than what was claimed. If, as our disguised sale analysis concludes, (1) Santa Barbara's contribution of the Encol receivables to XBOXT, (2) XBOXT's contribution of the receivables to PIMLICO, and (3) XBOXT's sale of its 89.1% interest in PIMLICO to Mr. Howard were integrated into a single transaction, the result would effectively be a direct sale of the receivables from Santa

SPA-11

11

**[\*11]** Barbara to Mr. Howard. The tax consequence of such a sale would be that Mr. Howard would have received a cost basis in the receivables under section 1012, as opposed to the significantly larger basis claimed to be transferred from Santa Barbara through XBOXT and then to PIMLICO under section 721. The subsequent contribution of the receivables to PICCIRC would be deemed made by Mr. Howard himself, and PICCIRC's basis would be equal to Mr. Howard's cost basis. *See* § 721. The subsequent sale of the receivables by PICCIRC would, in turn, produce significantly lesser losses. The parties' aggregate federal tax liability would, consequently, be substantially higher.

Further, Santa Barbara had no risk of loss because XBOXT and PICCIRC had no activities besides the sale of tax shelters. Santa Barbara had a nominal interest in XBOXT and no real participation. Upon our consideration of the facts and circumstances, we conclude that the partnerships should be disregarded for violation of the partnership antiabuse rules.

V.     *Other Issues Petitioner Raises*

Petitioner contends that it was in compliance with the Code and that the Court should not address judicial antiabuse doctrines such as economic substance, sham transaction, business purpose, and step transaction. Respondent disagrees with this argument. We do not need to address the arguments associated with these doctrines because we have concluded that the transaction was a disguised sale and the partnerships were shams. An analysis similar to that discussed above would be used for an analysis under these doctrines. A discussion of these doctrines would not change our conclusion that respondent's determination is correct.

VI.     *Accuracy-Related Penalties*

Section 6662 provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Section 6662(h)(1) increases the penalty rate from 20% to 40% to the extent that the underpayment is attributable to a gross valuation misstatement. A gross valuation misstatement exists where the value or adjusted basis of the property claimed on a return is 400% or more of the amount determined to be

SPA-12

12

**[*12]** correct.[6]    If the value or adjusted basis of the property is determined to be zero, the gross valuation misstatement penalty is applicable.  Treas. Reg. § 1.6662-5(g).

Section 7491(c) generally places the burden of production of evidence on the Commissioner with respect to a taxpayer's liability for any penalty imposed by the Code.  § 7491(c).  In cases involving partnerships to which the TEFRA provisions apply, as is the case here, section 7491(c) does not apply.  *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 235–36 (2018).  Petitioner therefore carries the burden of showing that respondent's determination to impose the penalty is erroneous.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115.

Under our disguised sale analysis, PICCIRC's basis is, at the most, $300,164.  PICCIRC's reported basis of $23,075,495 on the 2002 partnership return is well in excess of 400% of the correct basis.  Petitioner produced no evidence to refute respondent's determination concerning the penalty.  Further, petitioner's posttrial briefs fail to address the accuracy-related penalty.  We deem petitioner to have conceded the issue, and we sustain respondent's penalty determination at the heightened rate.  *See* Rule 151(e)(4) and (5); *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (first citing *Clajon Gas Co. v. Commissioner*, 119 T.C. 197, 213 n.17 (2002), *rev'd*, 354 F.3d 786 (8th Cir. 2004); then citing *Davis v. Commissioner*, 119 T.C. 1, 1 n.1 (2002); then citing *Nicklaus v. Commissioner*, 117 T.C. 117, 120 n.4 (2001); and then citing *Rybak v. Commissioner*, 91 T.C. 524, 566 n.19 (1988)).

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[6] The Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, 120 Stat. 780, effected certain amendments to the gross valuation misstatement penalty regime. Before the enactment of the PPA, the penalty applied when taxpayers misstated the value of property by 400% or more; PPA § 1219(a)(2), 120 Stat. at 1083, lowered the threshold to 200%.  *See* § 6662(h).  This case involves a return filed before the effective date of the PPA (August 17, 2006), and therefore we apply the higher threshold.

SPA-13



# United States Tax Court

Washington, DC 20217

76

PICCIRC, LLC, PIMLICO, LLC, A
PARTNER OTHER THAN THE TAX
MATTERS PARTNER,

      Petitioner

      v.                     Docket No. 4308-12.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent

## DECISION

Pursuant to the determination of this Court as set forth in its Memorandum Opinion (T.C. Memo. 2024-50), filed April 22, 2024, it is

ORDERED AND DECIDED: That the adjustments to the partnership items of PICCIRC, LLC, and the applicability of the penalty, as determined and set forth in the Notice of Final Partnership Administrative Adjustment dated November 15, 2011, for the partnership's tax year ended December 31, 2002, and upon which this case is based, are correct.

**(Signed) Joseph H. Gale**
**Judge**

**Entered and Served 04/24/24**